[No. 58986-1. En Banc. December 23, 1993.]

KERI J. ADCOX, ET AL, *Respondents*, v. CHILDREN'S
ORTHOPEDIC HOSPITAL AND MEDICAL CENTER,
*Appellant.*

16

*Reed McClure,* by *William R. Hickman* and *Peter M. Fabish; Gibbs & Houston,* by *Heather Houston; Weiss, Jensen, Ellis & Botteri,* by *Christopher H. Howard,* for appellant.

*Paul N. Luvera & Associates,* by *Paul N. Luvera, Jr.; Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins,* for respondent Adcox.

*Donovan R. Flora* and *James L. Holman,* for respondent Degel Guardianship.

*Linda B. Clapham* and *Kimberly D. Baker* on behalf of Washington Defense Trial Lawyers, amicus curiae for appellant.

*Bryan P. Harnetiaux* and *Gary N. Bloom* on behalf of Washington State Trial Lawyers Association, amicus curiae for respondents.

JOHNSON, J. — A 12-week-old boy suffered severe and permanent brain damage after undergoing cardiac arrest at Children's Orthopedic Hospital and Medical Center (hereinafter Hospital). A jury found the Hospital negligent in failing to prevent the cardiac arrest and awarded damages of approximately $10 million. On appeal, the Hospital argues the trial court erred in failing to allocate fault between the Hospital and two physicians who settled with the plaintiffs before trial. We conclude the Hospital failed to preserve this issue for appeal and we reject the Hospital's other challenges. We affirm the trial court's judgment.

## I

### Facts

### Background

Brandan Briggs was born to Keri Adcox on April 24, 1984. He was delivered by Dr. David Lush. During his first few weeks of life, whenever Brandan cried he became short of breath and turned blue. Adcox asked Dr. Lush about Brandan's condition and was eventually referred to Dr. Paul Herndon, a pediatric cardiologist.

After some preliminary examinations, Dr. Herndon placed Brandan into Children's Orthopedic Hospital and Medical Center for diagnosis and surgery.

On July 17, 1984, when Brandan was 12 weeks old, Dr. Herndon performed a cardiac catheterization. Cardiac catheterization is a diagnostic procedure to study the internal workings of the heart. After the catheterization was completed, Brandan spent $1^1/2$ hours in a recovery room, and then returned to his room in the infant acute care unit at approximately 11 a.m. Nurse Canfield-Lucius and student nurse Menefee were the two nurses working in the room at the time.

When Brandan arrived at the room, the nurses placed him under an oxygen hood pursuant to Dr. Herndon's orders. Dr. Herndon had instructed the nurses to keep Brandan calm. The nurses removed Brandan from the oxygen hood at 1 p.m. after he became fussy and agitated. While Brandan was not under the hood, he received oxygen through a hose held near his nose and mouth.

Brandan suffered a cardiac arrest at approximately 3:15 p.m. From 1 p.m. until the time of his cardiac arrest, Brandan had not been returned to the oxygen hood. A nursing aide administered cardiopulmonary resuscitation to Brandan. Brandan was resuscitated. Some infant formula was found in Brandan's trachea. Brandan suffered extensive and severe brain damage as a result of this incident.

Brandan later underwent successful surgery to correct his heart defect. However, as a result of his brain damage, he will never be able to provide for himself or take care of

himself. He suffers from cortical blindness and can see only peripherally. He will never walk. He cannot move himself in a wheelchair. He will never have control over his bodily functions. He will always require attendant supervision and care. His brain injury places him at risk of airway problems, respiratory infection, prolonged seizures, and orthopedic problems due to immobility. He will never be able to speak in sentences. Brandan is expected to reach a mental age of no more than 1 year.

Keri Adcox filed suit on behalf of Brandan and herself on February 25, 1988. She sought recovery for the damages flowing from Brandan's cardiac arrest.[1] The three primary defendants were Dr. Lush, Dr. Herndon, and Children's Orthopedic Hospital and Medical Center.

The complaint generally made the following allegations against each of these defendants: Dr. Lush should have realized the potential for cardiac problems and failed to seek timely consultation with heart specialists; Dr. Herndon negligently performed the catheterization, failed to recognize Brandan's precarious condition, and failed to instruct the nursing staff of Brandan's condition and the appropriate level of care; and the Hospital failed to properly monitor Brandan's condition, failed to recognize the severity of Brandan's vital signs and symptoms, failed to set proper nursing care standards, and generally failed to reasonably and prudently care for Brandan.

## Pretrial Proceedings

The plaintiffs settled their claims against Dr. Lush and Dr. Herndon prior to trial. Dr. Lush agreed to pay the plaintiffs $20,000 and loan them an additional $77,500 to be repaid from proceeds of the suit against the remaining defendants. A reasonableness hearing was held, and Pierce County Superior Court Judge Waldo Stone approved the settlement on February 10, 1989.

---

[1]Darrell Briggs, Brandan's father, was also a plaintiff, but took a voluntary nonsuit from the case shortly before trial.

Dr. Herndon agreed to settle with the plaintiffs for $600,000. The Hospital objected to the settlement amount, and it cited the testimony of four expert medical witnesses who had concluded Dr. Herndon was negligent. A reasonableness hearing was held, and Judge Stone approved the $600,000 settlement on April 20, 1990.

The Hospital moved for a partial summary judgment seeking dismissal of Keri Adcox's claim under the applicable statute of limitations, RCW 4.16.350. The trial court denied the motion.

The plaintiffs twice moved to compel discovery of documents that the Hospital generated during its internal investigation into Brandan's cardiac arrest. Judge Stone denied both motions, concluding these documents were immune from discovery. Judge Stone subsequently granted discovery after the plaintiffs brought a third motion, this time contending the Hospital had waived its right to immunity. Judge Stone subsequently allowed the plaintiffs to use the internal documents in deposing a number of witnesses. At trial, Judge Stone allowed the parties to use the documents in questioning witnesses, but did not allow them to be admitted into evidence.

In other pretrial rulings, the judge considered two alternative methods for determining how the Hospital's potential share of damages should be affected by the plaintiffs' prior settlements with Dr. Herndon and Dr. Lush. One alternative was to have the jury allocate percentages of fault among the Hospital and the two doctors. Under this allocation theory, the Hospital's proportionate share of damages would be determined by applying the Hospital's percentage of fault against the plaintiffs' total damages. The second alternative was to hold the Hospital responsible for the entire amount of the damages, then to offset the settlement amounts already paid by the doctors, those settlements already having been adjudged reasonable as noted above.

This allocation/offset issue first arose during oral argument on November 27, 1991, of the plaintiffs' motion in limine to exclude evidence of fault of Dr. Herndon and Dr.

Lush. The plaintiffs argued for offset and for exclusion of evidence of fault. The Hospital did not clearly commit itself on the allocation/offset issue. Judge Stone tentatively indicated being in favor of offset rather than allocation, but did not formally enter an order on this issue.

On December 4, 1991, just moments prior to the delivery of opening statements, the Hospital sought a final ruling to clarify the issue of allocation versus offset. Judge Stone rejected allocation in favor of offset. Under this ruling, if the Hospital were found to be negligent, it would be entitled to an offset, or credit, from the settlement with the doctors. As part of his ruling, the trial judge determined the Hospital could not present expert evidence the doctors violated any standard of care. However, the trial court did not entirely foreclose the issue of the doctors' negligence. The trial court indicated the performance and credibility of the doctors would be appropriate areas of inquiry at trial. At no point during these pretrial rulings excluding evidence of the doctors' negligence did the Hospital offer any proof as to what fault or negligence its evidence would have shown.

### Trial

The Hospital's theory of the case at trial was that no one, including the Hospital and the doctors, was negligent. The Hospital argued Brandan's cardiac arrest resulted from Brandan's sudden aspiration of infant formula. Aspiration is the regurgitation of stomach contents into the throat and inhalation of those contents into the lungs. The Hospital pointed to the fact that infant formula was found in Brandan's trachea after his cardiac arrest and resuscitation. The Hospital did not attempt to introduce evidence, or make an offer of proof, that either of the two doctors had been negligent.

The plaintiffs' theory of the case was that Brandan's arrest was caused by progressive hypoxia, and this occurred because Brandan did not receive sufficient oxygen after the nurses removed him from the oxygen hood. Plaintiffs argued the nurses should have recognized and acted upon Brandan's deteriorating condition.

After a 5-week trial, the jury found the Hospital negligent and determined this negligence proximately caused Brandan's injury. The jury awarded to Brandan the following damages:

| | |
|---|---|
| Past Economic Damages | $ 56,346 |
| Future Economic Damages | 4,400,000 |
| Noneconomic Damages | 4,628,750 |
| Brandan's Total Award | $9,085,096 |

The jury also awarded Keri Adcox damages of $1,250,000.

The jury specifically found Keri Adcox had commenced her lawsuit within 1 year of when she reasonably should have discovered the factual basis of her cause of action. The jury was not asked to allocate a percentage of fault between the Hospital and Dr. Lush and Dr. Herndon.

The court ordered, pursuant to its pretrial ruling, the plaintiffs' damages be offset by the amounts they received in settlement from Dr. Herndon and Dr. Lush. The trial court denied the Hospital's motion for a new trial.

The Hospital appealed the verdict, and this court granted direct review.

## II

### ANALYSIS

### Issue One—Allocation Versus Offset

The Hospital contends the trial court's refusal to allocate fault among the Hospital, Dr. Herndon and Dr. Lush violated RCW 4.22.070(1).[2] This statute, as well as its inter-

---

[2]Former RCW 4.22.070(1) provides in relevant part as follows:

"(1) In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages, including . . . entities released by the claimant. . . . Judgment shall be entered against each defendant except those who have been released by the claimant. . . . The liability of each defendant shall be several only and shall not be joint except:

"(a) A party shall be responsible for the fault of another person or for payment of the proportionate share of another party where both were acting in concert or when a person was acting as an agent or servant of the party.

"(b) If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against

play with the related provisions in RCW 4.22.070(2) and RCW 4.22.060, was recently interpreted in *Washburn v. Beatt Equip. Co.,* 120 Wn.2d 246, 840 P.2d 860 (1992).[3] The Hospital contends that just as in *Washburn,* the percentages of fault should have been allocated among all the defendants, including the settling defendants, and the Hospital's responsibility for damages should have been limited according to the percentage of its fault. *See Washburn,* 120 Wn.2d at 290-99.

 While the Hospital is correct that former RCW 4.22.070(1) mandates allocation as the appropriate method of apportioning responsibility for the plaintiffs' award, the Hospital failed to claim its right to allocation by producing evidence of the fault of another party. Nor did the Hospital preserve this issue for appeal by making an offer of proof during trial. As such, the Hospital has not given us any basis upon which we can say that the statute's allocation procedure even applies, much less provide us with a basis for remanding for allocation.[4]

RCW 4.22.070 is not self-executing. It does not automatically apply to each case where more than one entity could theoretically be at fault. Either the plaintiff or the defendant must present evidence of another entity's fault to invoke the statute's allocation procedure. Without a claim that more than one party is at fault, and sufficient evidence to support that claim, the trial judge cannot submit the issue of allocation to the jury. Indeed, it would be improper for the judge to allow the jury to allocate fault without such evidence. If the plaintiff signals an intention to present evidence of fault solely against one defendant, as in this case, it is incumbent upon the defendant to provide proof that

whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants total damages."

[3]*Washburn* was decided after the trial in this case concluded.

[4]In light of this holding, we do not reach the constitutional challenges to RCW 4.22.070 raised by the plaintiffs and an amicus group. *See State v. Zakel,* 119 Wn.2d 563, 567, 834 P.2d 1046 (1992) (holding this court will not address constitutional arguments unless absolutely necessary).

more than one entity was at fault. The Hospital failed to present any evidence of the possible negligence of Dr. Lush and Dr. Herndon. Instead, the Hospital chose the legal theory that there was no negligence in this case. Moreover, the Hospital did not even take a clear position on the issue of whether allocation of fault was required under Washington's statutes. The Hospital cannot now be heard to complain it was not afforded allocation.

Although the record indicates the trial court decided upon offset as the appropriate method of apportioning damages, the trial judge also indicated he would allow evidence of how the doctors "screwed up and about what". 5 Report of Proceedings, at 23-24. If the judge's ruling on the issue of offset or allocation of damages did not foreclose the subject of the doctors' negligence during trial, then the Hospital simply failed to meet its burden of presenting evidence sufficient to invoke allocation under RCW 4.22.070(1). On the other hand, even if we assume the judge meant to prohibit any evidence of the doctor's negligence, the Hospital is still not entitled to allocation because it failed to make an offer of proof and thus preserve the issue for appeal.

 Under Rule of Evidence 103(a)(2), a party may not challenge a trial court's ruling excluding evidence unless "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked". Here, an offer of proof was required, for nothing in the context of the pretrial oral arguments on this issue gave the trial court any indication as to how the doctors might have been negligent or at fault in this case.

An offer of proof serves three purposes when a trial judge is considering the exclusion of evidence:

> [I]t informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review.

*State v. Ray*, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991). While the offer of proof need not be "in detail", *Ray*, 116 Wn.2d at 539, the offer must communicate to the trial court

the substance of the evidence in question so as to make clear to the trial court what is being offered in proof, and why the offer should be admitted over the opponent's objections, so the court may make an informed ruling. *Ray,* 116 Wn.2d at 539.

However, at no point during the trial court's pretrial allocation/offset rulings did the Hospital present any evidence or make any offer of proof regarding fault of Dr. Herndon or Dr. Lush. The trial court was left entirely in the dark as to the substance of the testimony the Hospital would have produced to show fault. The trial judge stated on the record during postjudgment motions he would have considered a proper offer of proof during the pretrial motions. An offer of proof was essential at this point to show the judge there was sufficient evidence to go to the jury on the question whether more than one entity bore fault. The offer of proof would have informed the trial court of the legal theory under which the evidence of the doctors' fault should have been admitted.[5]

Moreover, an offer of proof was critical for the purpose of creating an adequate record for review. Even if the parties understood the trial judge as having definitively decided on offset, an offer of proof would have created a record from which this court could determine whether the case should be remanded for allocation. Without such an offer, it is impossible for us to determine whether there was sufficient evidence to create an issue of fact about allocation for the jury.

The Hospital nevertheless contends a sufficient showing of proof was made. The Hospital points out the same trial judge had conducted the reasonableness hearings as to the settlement agreements between the plaintiffs and Dr. Herndon and Dr. Lush. During those hearings the parties presented evidence regarding the fault of the doctors' acts.

---

[5]The Hospital's trial brief took the position it was entitled to an offset for the doctors' settlements, and as to allocation of fault merely "suggested", due to the lack of appellate interpretation of the relevant statutes, the court provide a verdict form allowing allocation. The Hospital's oral arguments to the trial court were equally as equivocal on the allocation issue.

This argument is unpersuasive. The reasonableness hearings were held years before the rulings at issue here. The first reasonableness hearing was held in February 1989 and the second was held in April 1990, yet the allocation/offset rulings were made in late November/early December 1991. Moreover, at no point during the allocation/offset colloquy did the Hospital attempt to resubmit these materials or even refer the court to their existence. Under these circumstances the trial judge cannot be expected to remember the substance of evidence presented to him years earlier.

It was not until the oral argument of posttrial motions, after approximately 5 weeks of trial, that the Hospital made any offer of proof on this point. Although we have sometimes held a posttrial offer of proof is sufficient to preserve appellate review, *see Ray,* 116 Wn.2d at 539-43, it is not sufficient here. In this case, the Hospital made a deliberate choice at trial not to present evidence of the doctors' negligence or fault. Such evidence would have undercut its own theory of defense. The Hospital's theory was that Brandan's cardiac arrest was unrelated to any of the care he had received following his catheterization; the arrest was due to sudden choking. Under this theory, the arrest was a sudden and unforeseeable event, thus no party, not the Hospital, not Dr. Lush and not Dr. Herndon, could have been negligent.

Most importantly, the Hospital's choice was independent of the trial court's ruling excluding evidence. The Hospital had chosen its theory of defense — sudden aspiration — prior to the trial court's final rulings on allocation and exclusion of evidence of the doctors' negligence. The Hospital's trial brief set out this theory of defense, and it was dated 2 days prior to the trial judge's final rulings.

■ Thus, the Hospital deliberately chose, as a matter of its own trial strategy, not to pursue the fault of Dr. Herndon and Dr. Lush at trial; not to make an offer of proof at the critical time when the trial judge was deciding whether to exclude the relevant evidence; not to take any clear position about allocation of fault during the pretrial rulings; not to try to present any such evidence at trial; not to propose a

jury verdict form addressing the issue; not to create a record from which an appellate court might remand for allocation. Then, following 5 weeks of trial and an adverse jury verdict, the Hospital attempts to create an issue for appeal by making an offer of proof as to the doctors' negligence and arguing apportionment of fault was required under Washington's statutes.

A posttrial offer of proof is not sufficient under these circumstances to preserve appellate review. Whereas under *Ray,* we want to encourage parties to make offers of proof at least by the time of postjudgment motions in order to give trial judges opportunity to review their earlier evidentiary rulings, we will not allow parties to take positions inconsistent with those taken at trial.

Issue Two—Internal Investigation Documents

The Hospital contends the trial court erred in granting discovery of the documents generated during the Hospital's internal investigation[6] and in allowing the documents to be used in questioning witnesses at trial. The Hospital maintains these orders violate RCW 70.41.200 and RCW 4.24.250.

RCW 70.41.200 requires hospitals to establish quality assurance committees which will review hospital services in order to improve patient care and prevent medical malpractice. RCW 70.41.200(1)(a). Documents generated by these committees are entitled to special protection:

---

[6]The documents at issue are as follows: (1) a 1-page memo, dated the day of Brandan's cardiac arrest, written by a registered nurse with the title of quality assurance coordinator, addressed to Dr. John Neff, chairman of the peer review committee, summarizing the events leading up to Brandan's cardiac arrest; (2) a 1-page memo, dated 3 days after the arrest, with the same author and addressee as above, summarizing Nurse Canfield-Lucius' description of the events surrounding the arrest; (3) Dr. Herndon's minutes from a meeting he called the day after Brandan's arrest in order to review what had occurred; also attending the meeting were Dr. Ron Lemire, Nurse Beaunaux (head nurse from the infant unit), Nurse Canfield-Lucius and Dr. Herndon's partner; and (4) Dr. Lemire's memo to Dr. Neff, concluding after talking to Nurse Canfield-Lucius the cardiac arrest was "not due to any specific negligent factors on either the hospital or the staffs part"; Dr. Neff thereafter wrote on the memo his own conclusion that further investigation would not be fruitful. Brief of Appellant apps. A-D.

Information and documents, including complaints and incident reports, created, collected, and maintained about health care providers arising out of the matters that are under review or have been evaluated by a review committee conducting quality assurance reviews are not subject to discovery or introduction into evidence in any civil action . . . .

Former RCW 70.41.200(3).

We conclude, however, this statute does not apply to the internal investigation documents which were created in 1984, 2 years prior to the statute's enactment. *See* Laws of 1986, ch. 300, § 4. Absent contrary legislative intent, statutes are presumed to operate prospectively only. *Washington Waste Sys., Inc. v. Clark Cy.,* 115 Wn.2d 74, 78, 794 P.2d 508 (1990). The Legislature has not expressed any intent for retroactive application of RCW 70.41.200.

This presumption in favor of prospectivity is strengthened when the Legislature, as here, uses only present and future tenses in drafting the statute. *Johnston v. Beneficial Mgt. Corp. of Am.,* 85 Wn.2d 637, 641-42, 538 P.2d 510 (1975), *modified on other grounds in Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 581 P.2d 1349 (1978). Moreover, former RCW 70.41.200(5) creates a new civil penalty for noncomplying hospitals, and statutes imposing new penalties are applied prospectively only. *Johnston,* 85 Wn.2d at 642; *State v. Fisher,* 108 Wn.2d 419, 426 n.3, 739 P.2d 683 (1987).

Because applying RCW 70.41.200 to documents that were created prior to the statute's enactment would contravene legislative intent, we conclude RCW 70.41.200 does not apply to this case.

The second statute relied on by the Hospital is RCW 4.24.250. This statute was in effect in 1984. The statute creates certain immunities that come into play when a hospital has formed "a regularly constituted review committee . . . whose duty it is to review and evaluate the quality of patient care". At issue in the present case is the following language:

The proceedings, reports, and written records of such committees . . ., or of a member, employee, staff person, or investigator of such a committee . . ., shall not be subject to subpoena or discovery proceedings in any civil action . . . .

RCW 4.24.250.

 We have already recognized that this statute, being contrary to the general policy favoring discovery, is to be strictly construed and limited to its purposes. *Coburn v. Seda,* 101 Wn.2d 270, 276, 677 P.2d 173 (1984); *Anderson v. Breda,* 103 Wn.2d 901, 905, 700 P.2d 737 (1985). Moreover, the burden of proving the statute's applicability rests with the party seeking its application. *Anderson,* 103 Wn.2d at 905.

 Here, despite the plaintiffs' repeated arguments that a "regularly constituted review committee" never acted in this case, the Hospital at no point presented any evidence to show that such a committee even existed in 1984. The Hospital instead argued the informal review reflected in the internal investigation documents is sufficient to meet the requirements of RCW 4.24.250, especially when one of the participants in this review was designated a quality assurance coordinator.

Nevertheless, as we clearly stated in both *Coburn* and *Anderson,* this showing of an informal investigation is not sufficient under RCW 4.24.250. Rather, we recognized the statute requires a "regularly constituted review committee". We went further and specified how a hospital could prove its committee was "regularly constituted":

> [T]he trial court may wish to consider, in addition to other relevant evidence, the guidelines and standards of the Joint Commission on Accreditation of Hospitals and the bylaws and internal regulations of [the Hospital]. These materials may aid the trial court in ascertaining the organization and function of the committee as well as whether it is "regularly constituted".

*Coburn,* 101 Wn.2d at 278; *see also Anderson,* 103 Wn.2d at 905-06.

Here, despite the clear guidance of *Coburn* and *Anderson* and its repeated opportunities to present evidence, the Hospital never made any showing as to the factors listed above. The Hospital never presented any of its bylaws or internal regulations; never referred to the standards and guidelines of relevant accreditation bodies; and never even identified the committee members or the procedures

involved in reviewing hospital care in 1984.[7] We simply have no evidence the Hospital had in place a "regularly constituted" review committee in 1984. To the contrary, one of the doctors being deposed in this case believed the review committee existing today did not exist in 1984.

In *Coburn,* after we determined we did not have sufficient evidence upon which to determine whether a particular review committee was "regularly constituted", we remanded for further evidentiary proceedings on this point. *Coburn,* 101 Wn.2d at 279. Such a remand is not appropriate in the present case. In *Coburn,* this court required exactly what the statute describes — a review committee that is "regularly constituted". We held the same in *Anderson,* and also made explicit what was already implicit — the burden of proof is on the hospital on this issue. Given the notice these cases imparted to the Hospital, and the Hospital's multiple opportunities to present evidence on these points below, we can only conclude a remand would be futile. We hold instead the Hospital simply failed to meet its burden of proving RCW 4.24.250 applies to this case.

■ Accordingly, we affirm the trial court's orders regarding the internal investigation documents, though on a basis different than the waiver theory adopted by the trial court. *See LaMon v. Butler,* 112 Wn.2d 193, 200-01, 770 P.2d 1027 ("[A]n·appellate court can sustain the trial court's judgment upon any theory established by the pleadings and supported by the proof, even if the trial court did not consider it."), *cert. denied,* 493 U.S. 814 (1989).

### Issue Three—Size of Verdict

The Hospital argues the jury's award of damages was excessive and seeks vacation of the award.

■ An appellate court's role in analyzing the size of jury verdicts is quite limited.

An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial

---

[7]The Hospital has not argued here its peer review committee or the participants at Dr. Herndon's review meeting constituted a "regularly constituted review committee" for purposes of RCW 4.24.250.

evidence in the record, or shocks the conscience of the court, or appears to have been arrived at as the result of passion or prejudice.

*Washburn,* 120 Wn.2d at 268 (quoting *Bingaman v. Grays Harbor Comm'ty Hosp.,* 103 Wn.2d 831, 835, 699 P.2d 1230 (1985)). An appellate court "rarely" overturns a jury verdict on this basis; it can review only the written record, while the factfinder and the trial judge were in the favored position of being able to evaluate the full range of evidence submitted. *Washburn,* 120 Wn.2d at 268 (citing *Bingaman,* 103 Wn.2d at 835).

The damages suffered by young Brandan were serious, extensive and, in many respects, permanent in nature. He will never reach a mental age of more than 1 year; he will never be able to take care of himself, or even be able to physically move his own wheelchair; he will never be able to speak a sentence; he will be subject to numerous complicating illnesses, including seizures, respiratory infections and orthopedic problems; and his life expectancy has been considerably shortened. The evidence also reveals the inevitable hardship these injuries caused on Brandan's mother. Considerable evidence was presented in support of the award of damages, including expert evidence from Brandan's pediatric neurologist, a vocational rehabilitation counselor, a speech and language pathologist, and an economist. In short, Brandan has lost fundamental enjoyment of his infancy, childhood and future adult life. Moreover, significant aspects of the mother-child relationship have been destroyed.

The Hospital attempts to overcome the heavy presumption in favor of jury awards by comparing the size of its verdict to jury verdicts in other cases. The Hospital cites primarily to the case of *Shaw v. United States,* 741 F.2d 1202 (9th Cir. 1984), in which the court stated it had reviewed Washington's reported verdicts in medical malpractice cases. The answer to the Hospital's argument was clearly stated in *Washburn*: "We conclude that it is improper to assess the amount of a verdict based upon comparisons with verdicts in other cases". *Washburn,* 120 Wn.2d at 268.

The jury awarded Brandan damages of approximately $56,000 for past economic damages, $4.4 million for future economic damages and $4.6 million for noneconomic damages. The jury awarded Brandan's mother damages of approximately $1.2 million. On the basis of the materials presented to us on appeal, we conclude the award is supported by substantial evidence, does not shock the conscience and was not improperly influenced by passion or prejudice. We reject the Hospital's challenge to the size of the verdict.

## Issue Four—Statute of Limitations

The Hospital claims Keri Adcox's claim was barred by the applicable statute of limitations, RCW 4.16.350.[8] This statute provides, in relevant part, that an action against a hospital for medical negligence:

> shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by [the] act or omission, whichever period expires later. . . .

RCW 4.16.350 thus provides two alternative limitation periods. Actions must be commenced either within a standard 3-year limitation period or under an alternative 1-year discovery rule.

Adcox did not file her cause of action within 3 years of Brandan's cardiac arrest: Brandan's cardiac arrest occurred on July 17, 1984, and Keri Adcox filed suit on March 1, 1988. Accordingly, the only issue before us is whether Adcox satisfied the requirements of RCW 4.16.350's 1-year discovery rule.

██ ██ Discovery rules such as RCW 4.16.350's require a claimant to "use due diligence in discovering the basis for the cause of action". *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992) (citing *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 772, 733 P.2d 530 (1987)). The question of when

---

[8]The Hospital makes no claim Brandan's cause of action should also have been barred.

a patient or representative reasonably should have discovered the injury was caused by medical negligence is normally an issue of fact. *Honcoop v. State,* 111 Wn.2d 182, 194, 759 P.2d 1188 (1988); *Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 510, 598 P.2d 1358 (1979). The key consideration under the discovery rule is the factual, as opposed to the legal, basis of the cause of action. *Allen,* 118 Wn.2d at 758.

The jury specifically found Adcox filed her action within 1 year of when she reasonably should have discovered the factual basis of her cause of action. In reviewing this finding,[9] as with any other jury verdict, we must determine whether it is supported by sufficient evidence. *See Industrial Indem. Co. of Northwest, Inc. v. Kallevig,* 114 Wn.2d 907, 916, 792 P.2d 520, 7 A.L.R.5th 1014 (1990).

In this case, Adcox testified she initially asked the doctors why Brandan had suffered cardiac arrest and was told the arrest was caused by Brandan's heart condition. For this reason, she did not learn of the role the Hospital and nurses played in Brandan's cardiac arrest until several years later. She consulted an attorney on a friend's advice in October 1987. After the attorney investigated the matter, she became aware of the facts that established her cause of action. Adcox's lawsuit was filed in March 1988. The Hospital did not present any evidence to dispute this. The jury could rationally conclude from the record before it that Adcox acted with due diligence.

We affirm the jury's factual determination and conclude Keri Adcox's cause of action was timely filed under RCW 4.16.350.

---

[9]The Hospital has assigned error not to the jury's verdict, but instead to the trial court's denial of its motion for partial summary judgment on this issue. Accordingly, the Hospital relies on the summary judgment pleadings and the evidence submitted therewith. These arguments miss the mark. When a trial court denies summary judgment due to factual disputes, as here, and a trial is subsequently held on the issue, the losing party must appeal from the sufficiency of the evidence presented at trial, not from the denial of summary judgment. *See Johnson v. Rothstein,* 52 Wn. App. 303, 759 P.2d 471 (1988).

Issue Five—Jury Instructions

■ The Hospital challenges a number of the trial court's jury instructions. Jury instructions challenged on appeal are reviewed to determine whether they permit the parties to argue their theories of the case, whether they are misleading, and whether when read as a whole they accurately inform the jury of the applicable law. *Douglas v. Freeman,* 117 Wn.2d 242, 256-57, 814 P.2d 1160 (1991).

The Hospital argues jury instruction 14 was misleading. This instruction told the jury that Nurse Canfield-Lucius and student nurse Menefee were employees of the Hospital and, further, their acts or omissions became the Hospital's acts or omissions.[10] The Hospital argues this instruction was improper insofar as it referred to student nurse Menefee. The Hospital contends (1) the evidence never established student nurse Menefee was employed by the Hospital, and (2) the trial court had already ruled at summary judgment student nurse Menefee did not breach the standard of care for a student nurse.

■ The trial court erred in issuing this instruction, for the record does not clearly establish student nurse Menefee was actually employed by the Hospital. For the following reasons, however, this error was harmless. "Harmless error is error which is trivial, formal, or academic". *See State v. Ray,* 116 Wn.2d 531, 543, 806 P.2d 1220 (1991).

■ The record clearly demonstrates Nurse Canfield-Lucius directly supervised, and was responsible for, student nurse Menefee's care in general. Furthermore, Nurse Canfield-Lucius testified she was "closely supervising" student nurse Menefee on the afternoon of Brandan's cardiac arrest. Nurse Canfield-Lucius was employed by the Hospital. Thus, even if student nurse Menefee was not the Hospital's employee, there can be no doubt she was the Hospital's agent. *See Adamski v. Tacoma Gen. Hosp.,* 20 Wn. App. 98,

---

[10]Instruction 14 reads as follows:

"You are instructed that Kristi Canfield-Lucius and Jane Menefee were employees of Defendant Children's Hospital and, therefore, any act or omission of Nurse Kristi Canfield-Lucius or Nurse Jane Menefee was the act or omission of the Defendant Children's Hospital."

99, 579 P.2d 970 (1978) (holding that a hospital is responsible for acts of medical personnel at its facility if either traditional agency principles (consent and control) are met or if under the theory of "ostensible agency" the hospital holds out the personnel as employees); *see also Douglas,* 117 Wn.2d at 248 (hospitals have nondelegable duty to "supervise all persons who practice medicine within its walls"). Another jury instruction properly informed the jury that "[a]ny act or omission as an officer, employee or agent is the act or omission of the hospital corporation". The Hospital did not object at trial to this instruction. Accordingly, whether student nurse Menefee was termed an employee or an agent, the Hospital was responsible for her acts and omissions.

■ While jury instruction 14 arguably conflicts with the summary judgment ruling as to student nurse Menefee, this conflict does little for the Hospital's position. A judge may reverse or modify a pretrial ruling at any time prior to the entry of final judgment. *See State v. Kinard,* 39 Wn. App. 871, 873, 696 P.2d 603, *review denied,* 103 Wn.2d 1041 (1985). When this happens, a party must demonstrate the trial ruling itself was erroneous in order to secure a reversal. *See State v. Brooks,* 20 Wn. App. 52, 60, 579 P.2d 961 (if evidence is admitted at trial contrary to a pretrial order in limine, reversal is not required unless the trial ruling was erroneous), *review denied,* 91 Wn.2d 1001 (1978). The Hospital has not shown any reversible error was committed with regard to jury instruction 14.

The Hospital next challenges jury instructions 18, 19 and 20 as a group. Jury instruction 18 told the jury a hospital's nursing staff "is obligated" to follow hospital rules and policies, and violation of rules or policies, while not necessarily constituting negligence, could be considered in determining negligence. Jury instruction 19 restated the requirements of WAC 246-318-440 as to maintaining adequate patient records. Jury instruction 20 restated the requirements of WAC 246-318-440(5) regarding the entries a hospital is required to make on patient medical records.

38

■ The Hospital contends these instructions unduly emphasized the plaintiffs' theory of the case, thereby depriving it of a fair trial. In support, the Hospital cites *Brown v. Dahl,* 41 Wn. App. 565, 579, 705 P.2d 781 (1985) and *Samuelson v. Freeman,* 75 Wn.2d 894, 897, 454 P.2d 406 (1969). These cases make clear that in order to obtain a reversal on this ground, the instructions on a particular point must be so repetitious as to generate an "extreme emphasis" that "grossly" favors one party over the other. *Samuelson,* 75 Wn.2d at 897; *Brown,* 41 Wn. App. at 579.

By contrast, we find the instructions in this case to be balanced and nonrepetitious. Most jury instructions will naturally tend to support one party's theory over the other's. As long as the instructions allowed each party to argue its theory of the case, without undue emphasis or repetition, no error is committed. That standard is met here.

■ The Hospital also contends these instructions constituted impermissible comments on the evidence in violation of Const. art. 4, § 16 and Superior Court Civil Rule 51(j). We disagree. A trial judge does not impermissibly comment on the evidence when, as here, the instructions accurately state the applicable law. *Hamilton v. Department of Labor & Indus.,* 111 Wn.2d 569, 571, 761 P.2d 618 (1988) (and cases cited therein). Rather, an impermissible comment is:

> one which conveys to the jury a judge's personal attitudes toward the merits of the case or allows the jury to infer from what the judge said or did not say that the judge personally believed or disbelieved the particular testimony in question.

*Hamilton,* 111 Wn.2d at 571. The challenged instructions did not convey the trial court's beliefs regarding the merits of the case or any testimony.

Finally, the Hospital challenges jury instruction 2. In that instruction, the trial court informed the jury that because a guardian had been appointed for Brandan, his parents "cannot directly benefit from this suit nor will they have any financial interest in any judgment recovered in this case". The instruction further provided that "[s]uch a judgment

would be solely the property of the incompetent, subject to the control and jurisdiction of this Court".

The Hospital labels this instruction misleading. The Hospital had offered to prove at trial Brandan's mother had previously borrowed money from Brandan's trust fund. The Hospital maintains the instruction is inconsistent with the offer of proof, and thus is not supported by substantial evidence. The Hospital does not argue the instruction inaccurately states the law; all the Hospital contends is the instruction is inconsistent with the Hospital's allegations about previous trust transactions.

Jury instruction 2 was properly given. The jury was entitled to learn who had control over the money being awarded to Brandan. We will assume the instruction accurately states the law, inasmuch as the Hospital has not challenged that point. Moreover, the offer of proof and resulting colloquy demonstrates if such a loan occurred, it appears the loan was authorized by a court order. Thus, the transaction would have been consistent with the last sentence of jury instruction 2. We find no error in this instruction.

Issue Six—Collateral Source Evidence

The Hospital contends the trial court erred in keeping "collateral source" evidence from the jury. Collateral source evidence relates to "benefits received by the plaintiff from sources wholly independent of and collateral to the wrongdoer". *Bowman v. Whitelock,* 43 Wn. App. 353, 357, 717 P.2d 303 (1986).

In the context of health care injuries, the admissibility of this type of evidence is controlled by RCW 7.70.080, which provides as follows:

> **Evidence of compensation from other source.** Any party may present evidence to the trier of fact that the patient has already been compensated for the injury complained of from any source except the assets of the patient, his representative, or his immediate family, or insurance purchased with such assets. . . .

RCW 7.70.080.

This statute reserves for the finder of fact — in this case, the jury — the task of examining the extent to which the plaintiff has already been compensated by third parties for the injuries incurred by the defendant and the additional task of offsetting these recoveries from the damages being assessed against the defendant.

For medical malpractice cases, RCW 7.70.080 replaces the common law's collateral source rule. The collateral source rule, still in effect for certain types of cases, provides that "a tortfeasor may not reduce damages, otherwise recoverable, to reflect payments received by a plaintiff from a collateral source, that is, a source independent of the tortfeasor". *Lange v. Raef,* 34 Wn. App. 701, 704, 664 P.2d 1274 (1983). The primary motivation in doing away with the collateral source rule is the rule allows plaintiffs to recover more than their total damages. Under the collateral source rule, a plaintiff could recover 100 percent of the damages from a liable defendant, even if the plaintiff had already recovered a portion of their damages from another source, such as insurance. Because the rule overcompensated plaintiffs, it came to be viewed as imposing unnecessary costs on society and causing higher insurance premiums. *See* Daena Goldsmith, Comment, *A Survey of the Collateral Source Rule: The Effects of Tort Reform and Impact on Multistate Litigation,* 53 J. Air L. & Com. 799, 802-03, 827-29 (1987-1988).

The trial court in this case did not follow RCW 7.70.080. The court did not allow the jury to hear and evaluate certain collateral source evidence being proffered by the Hospital.[11] Instead, the trial judge instructed the parties that he himself would decide any appropriate collateral source offsets as part of a posttrial hearing.

 The trial court committed error in this regard, but we find it to be harmless. The only difference between the

---

[11]The Hospital offered to prove some of the following collateral resources might be available as mitigating the plaintiffs' damages: school districts; state medical care; state respite care; state payments of foster care expenses; state insurance pool for the uninsurable; and charitable organizations providing services.

trial court's approach and RCW 7.70.080 concerned *who* would be making the determination. The trial court would be reducing the damage award by the appropriate offset for collateral source payments, just as the jury would have had responsibility for doing had the evidence been admitted at trial. The outcome should be the same under either approach.

The primary goal in eliminating the collateral source rule has been to prevent overcompensating plaintiffs in light of the resulting costs to society. This goal is met whether the offset called for in RCW 7.70.080 is conducted by the jury or the trial judge. Moreover, in the many states where legislatures have abrogated the collateral source rule in medical malpractice actions, legislatures have been "almost evenly split on whether the court or the jury will hear evidence that the plaintiff received collateral benefits". Goldsmith, Comment, 53 J. Air L. & Com. at 820. Accordingly, the purpose of eliminating the collateral source rule is met whether the determination is made by the court or the jury.

We are disinclined to reverse the jury verdict and require another 5-week trial merely because the judge, rather than the jury, took on responsibility for deciding the offset called for in RCW 7.70.080. We hold the error to be harmless. While we do not condone the trial court's failure to follow RCW 7.70.080 in its entirety, and we strongly encourage trial courts to fully follow the statute in the future, we find no reversible error.

We affirm the judgment below.

ANDERSEN, C.J., AND UTTER, BRACHTENBACH, DOLLIVER, SMITH, GUY, and MADSEN, JJ., concur.