[No. 44655-3-II.   Division Two.   December 16, 2014.]

LONNITA HASKINS, *Appellant*, v. MULTICARE HEALTH SYSTEM, *Respondent*.

*Joel D. Cunningham* and *J. Andrew Hoyal II* (of *Luvera Law Firm*); and *James L. Holman* (of *Holman Law PLLC*), for appellant.

*Rebecca S. Ringer* and *Amber L. Pearce* (of *Floyd Pflueger & Ringer PS*), for respondent.

[As amended by order of the Court of Appeals March 3, 2015.]

¶1 JOHANSON, C.J. — Lonnita Haskins appeals the trial court's judgment entered in favor of Multicare Health System d/b/a Tacoma General Hospital. She argues that (1) she was entitled to a jury instruction on res ipsa loquitur, (2) the trial court erred when it permitted Multicare to present evidence of collateral source payments, and (3) the trial court improperly instructed the jury about the burden of proof during voir dire and erred when it permitted Multicare's closing argument that the jurors could choose a burden of proof for themselves.

¶2 We hold that it was reversible error to fail to give Haskins's proposed res ipsa loquitur instruction and that it was not error to permit Multicare to present evidence of past collateral source payments. Accordingly, we vacate the judgment in Multicare's favor, remand for a new trial, and do not reach Haskins's voir dire and closing argument issues.

¶3 On cross appeal, Multicare argues that the trial court erred when it excluded Multicare's designated ER 615

in-court representative and when it declined to give Multicare's proposed jury instruction regarding the tax consequences of personal injury awards.

¶4 We hold that the trial court abused its discretion when it denied Multicare's request to designate an employee who is also a fact witness in the case as its in-court representative under ER 615, but it was not an abuse of discretion to decline to give Multicare's proposed jury instruction on the tax consequences of personal injury awards.

## FACTS

### I. HASKINS'S SURGERY

¶5 In 2007, Haskins was diagnosed with cervical cancer. After radiation treatments, Haskins had an Indiana pouch surgery in order to correct incontinence.

¶6 In March 2009, Dr. Bahman Saffari performed the surgery. Indiana pouch surgery involves removing portions of the large and small intestines and using them to create a new "urinary reservoir." 1 Report of Proceedings (RP) (Jan. 16, 2013) at 24. The patient's kidneys are essentially detached from the bladder and reconnected to the new Indiana pouch reservoir, bypassing the bladder. Indiana pouch surgery also involves the insertion of two stents to help drain urine into bags so that urine output is monitored during recovery and pressure is relieved on the pouch while it heals. Dr. Saffari also inserted a Malecot tube that allows hospital staff to flush the pouch.

¶7 Dr. Saffari thought that Haskins's surgery was successful and that there was an 80 to 90 percent chance that the new Indiana pouch would function as her bladder for the remainder of her life. However, during her recovery, Haskins experienced complications. At 4:00 PM on March 11, Haskins was recovering in the hospital and Nurse Shaleeni Fortner assessed Haskins and verified that her stents were secure.

¶8 At 9:59 PM, certified nurse assistant Ashley Barker emptied the urine bags. Barker was trained on how to handle lines and drains and knew that the stents attached to the urine bags should not be pulled. She denied that she would ever hang the urine bags over the bedside. She claimed she did not notice whether Haskins's stents had been pulled out because the blankets of her bed were covering the tubes. But Haskins's urine output was good.

¶9 At 11:00 PM, Haskins noticed that her stents were not putting out any urine. After Nurse Fortner and the charge nurse, Nurse Debbie Dick, made a complete assessment, they found that there had not been any urine output but that nothing appeared to be out of place and that there were not "any problems at the stent." 4 RP (Jan. 17, 2013) at 280-81.

¶10 At 11:45 PM, Nurse Rebecca Sumey noticed that Haskins's urine output was still low based on when Barker had last emptied the bags at 9:59 PM. Nurse Sumey was the first person to notice that Haskins's stents had become dislodged and testified that they had been pulled out about 14 inches. Nurse Sumey's entry in the records that night stated that the stents had been pulled out 50 to 60 centimeters. Haskins told Nurse Sumey that she thought the stents became dislodged when Barker hung the urine bags over the side of the bed.

¶11 The next morning, Dr. Saffari discussed Haskins's stents and urine output with her and she told him that she thought Barker had hung the urine bags over the side of the bed. However, at trial, Haskins did not remember anything that happened on March 11 and did not remember seeing the bags hanging over the side of her bed. Because the stents became dislodged, Haskins experienced acute renal failure. Although she made a complete recovery, because of the stent complications, Haskins required an additional procedure and additional recovery time to correct the problem with her stents and to avoid permanent kidney damage.

## II. The Trial

¶12 In a motion in limine, Haskins argued that evidence of collateral source payments should not be admitted because RCW 7.70.080 is unconstitutional. The trial court admitted evidence of past compensation but excluded evidence of future collateral source payments.

¶13 Multicare designated Barker as its in-court representative pursuant to ER 615. Haskins moved in limine to exclude Barker because she was a "critical witness." 1 RP (Jan. 14, 2013) at 3. The court agreed and granted Haskins's motion because Barker was a factual witness.

¶14 Haskins offered expert testimony from two witnesses, Dr. Oliver Dorigo, the chief gynecologic oncologist at Stanford University, and Karen Huisinga, a nurse practitioner. Both testified that the most likely explanation for her stents becoming dislodged 10 to 14 inches was hospital negligence. Nurse Huisinga also testified that hanging urine bags over the side of the bed falls below the standard of care for nurses and that, in her opinion, Haskins's injury probably happened when Barker hung the bags over the bedside.

¶15 Haskins also called Dr. Saffari and Nurses Fortner, Barker, Sumey, and Katherine Bechtold[1] as fact witnesses and to establish the appropriate standards of care in nursing. Haskins also testified.

¶16 Multicare also offered testimony from two experts: Cheyenne Haines, a nurse with experience caring for recovering surgery patients, and Dr. Karny Jacoby, a urologist who testified that she prefers not to perform Indiana pouch surgeries. Dr. Jacoby also provided an expert opinion that "[t]ubes fall out all the time" and that it often happens when patients roll around in bed or if patients are confused and pull them out themselves. 2 RP (Jan. 24, 2013) at 25.

---

[1] Nurse Bechtold was Multicare's chief nursing officer.

¶17 Multicare proposed a jury instruction stating that personal injury awards are not taxable. The instruction stated, "Any award to plaintiff will not be subject to federal income tax, and therefore you should not add or subtract for such taxes in fixing the amount of any award." Clerk's Papers at 163. The trial court refused to give the instruction because "it would conflict with the no insurance instruction." 5 RP (Jan. 29, 2013) at 184.

¶18 Haskins proposed the standard 6 *Washington Practice: Washington Pattern Jury Instructions: Civil* 22.01, at 255 (6th ed. 2012) instruction on res ipsa loquitur. She claimed that she was entitled to the instruction based on expert testimony and recent case law. Multicare argued that Haskins did not show that "she wasn't the sole cause" of her injury and that res ipsa loquitur should only be applied "sparingly." 5 RP (Jan. 29, 2013) at 147. The trial court declined to give Haskins's proposed instruction.

¶19 The jury found in Multicare's favor and the trial court entered judgment accordingly. Haskins appeals from that judgment.

## ANALYSIS

### THE COLLATERAL SOURCE DOCTRINE IN MEDICAL MALPRACTICE CASES AND THE CONSTITUTIONALITY OF RCW 7.70.080

¶20 Haskins argues that RCW 7.70.080, permitting parties to present evidence of past collateral source payments in medical malpractice cases, is unconstitutional because it violates separation of powers principles and, therefore, the trial court erred when it permitted Multicare to offer evidence of past collateral source payments.[2] Specifically, Haskins argues that the common law collateral

---

[2] Multicare argues, as a threshold issue, that Haskins failed to preserve the constitutionality question. We conclude that Haskins did preserve the issue because Haskins's motion in limine explicitly requested that the trial court either exclude evidence of collateral source payments because RCW 7.70.080 is unconstitutional or, in the alternative, limit the collateral source evidence that

source doctrine is a procedural court rule and where a statute conflicts with a procedural court rule, separation of powers principles are implicated and the statute is unconstitutional. We disagree. Because the common law collateral source doctrine is not a court rule and Haskins does not identify a formal court rule that conflicts with RCW 7.70-.080, there is no violation of separation of powers principles. Accordingly, RCW 7.70.080 is constitutional with respect to the admission of evidence of past collateral source payments and the trial court did not err when it permitted Multicare to present such evidence.

## RCW 7.70.080 Is CONSTITUTIONAL

¶21 There are some fundamental functions that are inherent in the power of the judicial branch; among them is the power to promulgate rules for practice in the courts. *Putman v. Wenatchee Valley Med. Ctr., PS*, 166 Wn.2d 974, 980, 216 P.3d 374 (2009). But where it is alleged that (1) a statute conflicts with a court rule, (2) we attempt to harmonize them and give effect to both but, where this is impossible, (3) the court rule prevails in procedural matters and the statute prevails in substantive matters. *Putman*, 166 Wn.2d at 980.

¶22 The procedure for adopting and amending court rules is explained in GR 9, entitled "Supreme Court Rule-making." This process involves a request to amend, adopt, or repeal a rule; the Supreme Court's initial consideration of the proposed rule; consideration by the Washington State Bar Association and the lower courts; the opportunity for notice and public comment; and final adoption by the Supreme Court. GR 9(d), (f)-(h).

¶23 Haskins's argument here fails at the first step in a separation of powers analysis because the collateral source doctrine is not a formal court rule. It was not adopted

---

Multicare could present to past compensation based on the language of the statute.

through the Supreme Court rule making process but is, rather, a common law doctrine. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 40, 864 P.2d 921 (1993) ("RCW 7.70.080 replaces the *common law's* collateral source rule" (emphasis added)). Haskins, therefore, points to no conflict between the statute and a court rule, but instead argues that the common law collateral source doctrine should be treated as if it were a formal court rule for the purpose of a separation of powers analysis. She points to no authority to support this argument, however, and we are aware of none. Without a formal court rule, there is no conflict between that rule and a statute and, thus, no violation of the separation of powers.

¶24 First, to support her argument, Haskins asks us to apply the holding from *Diaz v. State*, 175 Wn.2d 457, 285 P.3d 873 (2012), to this case. But *Diaz* is distinguishable. In *Diaz*, the plaintiff was misdiagnosed with cancer. 175 Wn.2d at 460. Diaz settled with some of the defendants and sought to exclude evidence of these settlements at trial, but the court admitted the evidence under RCW 7.70.080. *Diaz*, 175 Wn.2d at 461. Our Supreme Court held that RCW 7.70.080 violates separation of powers principles and is thus unconstitutional to the extent that it conflicts with ER 408, prohibiting the admission of settlement evidence generally, because ER 408 and RCW 7.70.080 cannot be harmonized and ER 408 is a procedural, not substantive, court rule. *Diaz*, 175 Wn.2d at 471.

¶25 Here, Haskins asks us to resolve a different kind of conflict. The conflict in this case is between the collateral source doctrine and RCW 7.70.080. Unlike ER 408, however, the collateral source doctrine is not a formal court rule, and Haskins does not argue that RCW 7.70.080 conflicts with any other formal court rule. We conclude, therefore, that *Diaz* does not apply.

¶26 Second, the separation of powers analysis that Haskins asks us to apply to resolve the conflict between RCW 7.70.080 and the collateral source doctrine has been

applied only to defeat statutes that conflict with formal court rules. *See, e.g., Diaz,* 175 Wn.2d at 470-71 (RCW 7.70.080 is unconstitutional where it conflicts with ER 408, prohibiting the admission of evidence of settlements); *Putman,* 166 Wn.2d at 982-85 (RCW 7.70.150 is unconstitutional because its requirement that plaintiffs file a certificate of merit with medical malpractice claims conflicts with pleading requirements in CR 8 and CR 11); *Waples v. Yi,* 169 Wn.2d 152, 158-61, 234 P.3d 187 (2010) (RCW 7.70.100(1) conflicts with CR 3(a) and is unconstitutional because it requires an additional step to commence a civil action in medical malpractice cases); *State v. Gresham,* 173 Wn.2d 405, 428-32, 269 P.3d 207 (2012) (RCW 10.58.090 conflicts with ER 404(b) because it permits the admission of prior misconduct for character evidence purposes). Haskins tries to equate the common law collateral source doctrine with a formal court rule in order to set up a separation of powers violation. Our precedent does not support this view, and her claim fails.

¶27 Finally, in *Adcox,* our Supreme Court recognized that RCW 7.70.080 "replaces" the common law collateral source doctrine. 123 Wn.2d at 40. In *Adcox,* the hospital sought to present evidence of collateral source payments to the jury and the trial court found that it, instead, would make any necessary collateral source offsets posttrial. 123 Wn.2d at 40. Our Supreme Court held that under the language of the statute, the hospital was entitled to present collateral source evidence to the finder of fact. *Adcox,* 123 Wn.2d at 40-41. Although the court was not asked to pass on the constitutionality of the statute, it stated that RCW 7.70.080 replaces the collateral source doctrine, acknowledging that RCW 7.70.080 was a proper exercise of legislative power. *Adcox,* 123 Wn.2d at 40-41.

¶28 Because the common law collateral source doctrine is not a court rule and Haskins does not identify a formal court rule that conflicts with RCW 7.70.080, there is no violation of separation of powers principles. Accordingly,

RCW 7.70.080 is constitutional with respect to the admission of evidence of past collateral source payments and the trial court did not err when it permitted Multicare to present such evidence.

¶29 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJORGEN and MELNICK, JJ., concur.

After modification, further reconsideration denied March 3, 2015.

Review denied at 183 Wn.2d 1020 (2015).