[No. 26499-4-II. Division Two. March 11, 2003.]

STEPHEN JOYCE, *Individually, as Personal Representative, and as Guardian, Respondent*, v. THE DEPARTMENT OF CORRECTIONS, *Appellant*.

570

574

*Gary E. Andrews* (of *Department of Corrections*) and *Christine O. Gregoire, Attorney General, Michael P. Lynch, Senior Counsel,* and *Glen A. Anderson* and *Michael E. Tardif, Assistants,* for appellant.

*Darrell L. Cochran* and *John R. Connelly, Jr.* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), for respondent.

HOUGHTON, J. — While under community supervision by the Washington State Department of Corrections (DOC), Vernon Valdez Stewart caused an automobile accident that killed Paula Joyce. Paula Joyce's family and her estate (the Joyce family) sued DOC and a jury awarded damages. On appeal, DOC argues that the facts do not support finding that DOC's duty to control Stewart extended to Paula Joyce or that its supervision of Stewart was the proximate cause of Paula Joyce's death. DOC also argues that the trial court made errors in submitting several jury instructions and in admitting certain evidence and that the jury award was excessive. We affirm.

## FACTS

On August 8, 1997, Stewart stole a vehicle and sped through a red light at an intersection in Tacoma. He collided with another vehicle, killing its driver, Paula Joyce.

At the time of the accident, Stewart was under community supervision as part of his sentence for a third degree assault/domestic violence conviction. In 1995, he pleaded guilty to third degree assault[1] after beating his girl friend and allegedly threatening her with a gun. Then, on December 5, 1996, he was sentenced to additional community supervision for possession of stolen property after being pulled over for speeding in a stolen vehicle.

The complex facts require a lengthy recitation of DOC's community supervision notes, Stewart's mental health treatment history, and his criminal history while under community supervision.

### Stewart's Community Supervision and Mental Health History

#### 1995

On September 8, 1995, the court sentenced Stewart to 90 days in jail for assault, most of which he had already served. The remaining nine days were converted to 72 hours of community service. Stewart was also sentenced to 24 months of community supervision and ordered to make restitution payments.

The conditions of Stewart's community supervision included completing his community service, not contacting his girl friend for five years, not purchasing or possessing deadly weapons, completing domestic violence counseling, obeying all laws, and making his legal financial obligation payments.

The King County presentence report for the assault conviction included information from police reports and the probable cause determination of Stewart's arrest. It detailed the abusive nature of his relationship with his girl friend and included various accounts of his assault against her. Stewart had no prior juvenile or adult felony convic-

---

[1] Under former RCW 9A.36.031 and .041 (1995), Stewart was initially charged with second degree assault and fourth degree assault.

tions. His misdemeanor convictions included two juvenile convictions for driving without a valid license and convictions of third degree possession of stolen property and obstructing a public servant.

On October 17, Stewart met with Cathy Lo, his community corrections officer (CCO), to review the conditions of his community supervision. Stewart told Lo that he lived with his mother and sister. Lo told him that she was required to visit him at home twice a month and would have to walk through his home on the first visit.

On October 19, Lo attempted to visit Stewart at home, but no one answered the door. She left a card telling Stewart to call her. On November 2, she attempted another home visit, but again no one answered the door.

On November 15, Stewart met with Lo at her office. He was one hour late for the appointment. Stewart had not completed any of his community service requirements, entered domestic violence counseling, or found a job. On November 16, Lo visited Stewart's home again. This time Stewart's mother answered the door and Stewart gave Lo a tour of the house.

On December 20, Stewart appeared for an appointment with Lo but left without seeing her. The next day, Lo went to Stewart's home, but again, no one answered the door. She left a card instructing Stewart to report on January 3, 1996. Stewart reported on that day and told Lo about his inability to begin his community service hours at a local food bank.

## 1996

On January 4, 1996, Lo went to Stewart's home and again, no one answered the door. Lo returned to Stewart's home on January 25, but a woman at the door said that Stewart was not home.

On February 7, Stewart did not show up for an appointment. The next day Lo went to Stewart's home but no one answered the door and she left a card telling him to call.

On February 13, Lo sent Stewart a letter advising him of his failure to report on February 7, to pay his legal financial obligations since December 1995, to undergo domestic violence counseling, and to do any community service. She told him that she was writing a violation report to submit to the court and to report on February 21.

Stewart appeared for his February 21 appointment with Lo. She reviewed his community supervision violations and they discussed his community service hours and finding a job. Lo said she had trouble reaching him at home and asked if he had another residence; Stewart said that he did not.

Lo explained that she had delayed sending a violation report because she was hoping for some improvements in his conforming to the community supervision conditions. She told Stewart that she would file the violation report but that she would remove the failure to report violation because he appeared for their current meeting. Lo advised Stewart that if he used the two to three months before the hearing to fulfill some of his conditions, she would recommend leniency to the court.

The next day, on February 22, Lo attempted to visit Stewart at home, but was told that he was not home.

On February 25, Lo issued a notice of violation of Stewart's community supervision conditions. The notice stated that Stewart failed to enter domestic violence counseling, failed to perform his community service, and failed to make the five dollar monthly restitution payments. Lo recommended that the court schedule a hearing, convert any remaining community service time to jail time, and sanction Stewart with 10 additional days of jail time. A hearing was noted for this motion for April 18.

On March 6, a Washington State Patrol trooper stopped Stewart on I-90 in Kittitas County for driving 86 mph. The trooper discovered that Stewart was driving a stolen car and arrested him. The State charged Stewart with first degree possession of stolen property, third degree driving

with a suspended license, and failure to sign a notice of infraction.

Presumably because of his arrest, Stewart failed to report to a March 6 meeting with Lo and she mailed Stewart a letter advising him to contact her immediately. Apparently, Lo did not learn about Stewart's possession of stolen property charge resulting from his traffic stop until April 18.

On March 11, Stewart called Lo. He claimed not to have received the March 6 letter because he did not retrieve his mail at his mother's house. Lo told him it was his responsibility to check his mail at his mother's house because that was the address she had on record for him. Stewart then told Lo that he had been spending a considerable amount of time at his father's house and gave Lo that address. Lo told him that he had missed his mandatory reporting for the month, but that she would give him one more chance. Lo rescheduled Stewart to report in on March 21.

Stewart reported to Lo on March 21, as required. They again discussed Stewart's failure to begin domestic violence counseling or complete community service. Stewart told Lo that he had not started the counseling or community service because he got nervous around groups of people.

On April 11, Stewart went to the Providence Medical Center emergency room complaining of auditory and visual hallucinations and paranoia. He was voluntarily admitted to the psychiatric intensive care unit. He was diagnosed with bipolar affective disorder with psychosis.

On April 16, Lo attempted to visit Stewart at his mother's house. Stewart's mother told Lo that Stewart had been in the Providence Hospital psychiatric ward since the previous week.

After Lo returned to her office, she received a message that Stewart had called and left the telephone number for his father's home. Lo called the Providence psychiatric ward and verified that Stewart had been admitted but, lacking a signed release, Lo could obtain no more informa-

tion. Lo then called Stewart's father, who also confirmed that Stewart was in the hospital. Because of Stewart's hospitalization, his April violation hearing was continued until May 21.

Providence Hospital released Stewart on April 25. On May 2, Lo visited Stewart at his mother's house. Lo asked Stewart about the rescheduled hearing. He claimed not to know what she was talking about and said that he had not received a hearing notice. Lo advised him to take responsibility for receiving his mail and to call her for a reporting appointment.

On about May 7, Stewart underwent a mental health assessment at Harborview Medical Center. At this assessment, Stewart again complained about "hearing and seeing things." Ex. 54, at 12.

On May 9, Stewart showed up at Lo's office without an appointment, but Lo could not see him. Lo mailed him a letter telling him to report again on May 16. He showed up for that appointment.

At the appointment, Stewart claimed not to know about the upcoming hearing or why he would need a lawyer. Lo suspected that Stewart was manipulating her because "he showed a sly smile on his face." 4 Clerk's Papers (CP) at 653. Lo again reviewed each of Stewart's violations with him, wrote down the hearing time and place for him, and advised him to get a lawyer. On May 21, Stewart failed to appear for his rescheduled violation hearing, and the court issued a bench warrant.

On June 5, Stewart called Lo. At her supervisor's direction, Lo reminded Stewart to get a lawyer and cautioned him that if he came to the office, he would be arrested on the bench warrant. He claimed not to know that he had a hearing and that he had not been told of his violations. Lo explained the violations again and repeatedly told him to get a lawyer.

On July 5, a public defender called the community supervision office to report that Stewart had a hearing

scheduled for July 17 to quash the bench warrant. But Stewart did not appear for that hearing.

Stewart occasionally went to appointments at Harborview Medical Center in the spring and summer of 1996. In August, the police took Stewart into custody on the outstanding bench warrant issued May 21. Lo later learned that he was arrested on August 22 by the Seattle Police Department for failure to comply with the bench warrant. On September 5, Stewart underwent a mental health evaluation at the King County Jail. The evaluator recommended that Stewart be referred for further evaluation. Stewart reported that he suffered memory lapses and that he ingested Risperdal, Valproxin, and lithium.

On October 2, in response to Lo's February 25 notice of violation, a King County superior court judge modified Stewart's sentence for failing to make legal financial obligations, failing to fulfill community service hours requirements, and failing to enter and complete domestic violence treatment. The court imposed a total of 39 days jail time and ordered Stewart to sign a release of his mental health records to Lo.

Lo's chronological report on Stewart indicates that he remained in custody in early October, but was released on October 8. Then, when Stewart failed to appear at a hearing in Kittitas County, that court issued a bench warrant for him. Stewart was apprehended on October 17 and held in the Kittitas County jail. He was still there on November 14.

On December 5, Stewart was found guilty of second degree possession of stolen property in Kittitas County. The court sentenced him to 75 days jail time, 12 months community supervision,[2] and ordered him to pay restitution.

On December 10, Stewart left a telephone message for Lo, leaving his mother's telephone number. The next day Lo

---

[2] The conditions of Stewart's community supervision required him to: maintain law-abiding behavior; not associate with other offenders; not move without first obtaining permission from his CCO; maintain full time employment or actively seek full time employment.

sent Stewart a letter to his mother's address telling him to report on December 17. Stewart did not appear for that appointment.

In mid-December, Stewart underwent another mental health assessment at Harborview Medical Center. Again, he complained of paranoia and visual hallucinations. He had received medication while previously incarcerated (valproic acid, Risperdal, lithium, and Vistaril) but was out of medication on the date of the evaluation.

Stewart called Lo on December 18 to say he just found the December 10 letter, and he rescheduled the appointment for December 19. Stewart did not appear at that appointment either. Later on December 19, Lo went to Stewart's mother's house. His mother said he was not there. Lo left a message for Stewart to call her to reschedule the appointment.

On December 23, the Kittitas County court imposed additional community supervision conditions, which included remaining within King County, notifying his CCO before changing or leaving his residence or employment, and reporting regularly to his CCO.

Stewart appeared on time for his appointment on December 23. Lo told him to seek domestic violence counseling at Harborview Medical Center because he was receiving outpatient mental health treatment there anyway. Lo also asked Stewart to sign the release for his mental health records, as was ordered at the October 2 court hearing. Stewart told Lo that his lawyer advised him not to sign anything until his doctor approved it. Lo gave Stewart copies of his judgment and sentence and the order modifying his sentence to show his doctor and explained that he would have to go back to court if he did not sign the release.

Lo also reviewed the Kittitas County judgment and sentence with Stewart at the December 23 meeting. They discussed the employment condition, Stewart's diagnosis of bipolar disorder, and whether a vocational training program would meet the employment requirement. As they

discussed the other conditions, Stewart told Lo that he would soon be homeless because his mother wanted him to move out of her home. Lo told Stewart that he needed her permission to change residences and that he needed to call her immediately if he moved.

Progress notes from Harborview Medical Center indicate that Stewart was evaluated on a follow-up basis on December 27, 1996 and January 7, 1997, at which time he indicated he was responding to medication.

## 1997

On January 6, 1997, Lo attempted to visit Stewart at his mother's house, but no one answered the door so she left a card. Stewart called Lo the next day and said he was in the process of moving out of his mother's house, but that he did not have a stable address because he was staying with various friends. Lo told Stewart to report in by telephone to her once a week on Tuesdays.

On January 14, Harborview Medical Center unsuccessfully attempted to contact Stewart and canceled his treatment on February 7, when he failed to appear.

Lo received messages that Stewart called to report in on January 17 and 27. On January 29, Stewart called and Lo asked why he had not reported on Tuesdays as she directed. Stewart told Lo that he forgot to call in and he was staying with friends "here & there." 4 CP at 657. Again, Stewart did not give Lo an address. Lo told Stewart to call the next day for an appointment, but he failed to do so.

Stewart called on February 5, and Lo told him to come in later that day. Stewart appeared and told her that he was participating in a general education equivalency program. Stewart told Lo that he still had not talked to his doctor about signing a release of information about his mental health treatment. Lo thought that Stewart appeared not to remember that he was required to obtain the release as a condition of his sentence modification. Lo attached her card

to a copy of the judgment and sentence and highlighted the release condition for Stewart to give to the doctor.

Stewart also told Lo that he was now homeless and that he did not have an address. He said that he occasionally received money from his sister, but did not remember her address or telephone number. Lo told Stewart to report in person every first and third Wednesday of the month.

Stewart did not report as directed, but called on February 20. Lo told him to report in person that day. There is no indication in the record that Stewart appeared for this appointment.

On February 26, Stewart received a ticket for third degree driving without a license. He pleaded guilty in Seattle Municipal Court.

Stewart called Lo but left no message on March 5. Stewart called again on March 11, and Lo told him to report in person that day. Stewart appeared for the appointment and they discussed his homelessness. Lo referred Stewart to shelters.

On March 12, Stewart again contacted Harborview Medical Center, complaining about suffering headaches when he was around crowds of people. Stewart's Harborview Medical Center progress reports indicate that he met with treatment providers there again on March 26, missed two appointments in April, but appeared for an appointment on April 23. He also appeared for appointments on May 21 and 27, but missed appointments on June 5, 11, and 19.

Stewart next reported to Lo's office on April 2, but Lo was on leave. On May 9, Lo left her position as a community corrections officer.

Stewart next called Lo's office on May 7. Lo's replacement, Odell Mosteller, reported that Stewart called without leaving an address. The next entry in the offender report is from Mosteller, indicating that the family, who now lived in Stewart's mother's former residence, did not want any more messages on their door. Mosteller then attempted to visit Stewart at an address listed on his returned mail. When no

one responded, Mosteller left a note telling Stewart to report on July 2.

On July 10, Stewart went to an appointment at Harborview Medical Center after missing a previous appointment. Stewart and his treatment provider discussed Stewart's bipolar disorder. On July 21, Mosteller had still not heard from Stewart. He called Stewart's father and left a message. That evening, mental health officials responded to a call at Stewart's mother's home. Apparently, Stewart was acting violently, smashing doors, cutting holes in walls with a knife, and setting toys on fire. He did not sleep and, instead, paced and spit all night. He was taken to the King County Jail and released on July 24.

On July 28, Mosteller issued two notices of violation of Stewart's community supervision conditions. In the first notice (Kittitas County sentence), Mosteller reported that Stewart had failed to report since May 2, Stewart failed to notify Mosteller before changing his address, and Stewart failed to pay his legal financial obligations. In the second notice, pertaining to the King County sentence, Mosteller reported violations identical to the first notice but included a statement that Stewart had been arrested in King County for failing to appear in court on a charge of driving with a suspended license on or about February 26. Mosteller recommended that the court schedule a hearing and sanction Stewart to 20 days in the Kittitas County Jail and 20 days in the King County Jail.

On August 7, Stewart's mother appeared at Harborview Medical Center in person to discuss Stewart's condition. She reported that Stewart had been in jail, but that he was presently out. He had been turning off the power to the home she and Stewart shared. Stewart's mother was afraid of him. On August 8, Mosteller received a call from a newspaper reporter, who told him of the automobile accident that killed Paula Joyce.

Stewart's conviction summary as of August 8 includes, among other convictions, four driving with a suspended license convictions, two possession of stolen property con-

victions, and one theft conviction. His driving record as of August 8 lists approximately 28 violations for offenses including driving without a license, seat belt law violations, driving without liability insurance, speeding, failing to properly signal, a defective muffler, and defective equipment.

Stewart never complied with the court order to sign a release allowing his community supervision officers to see his mental health treatment records.

## Procedural History

Following the automobile accident that took Paula Joyce's life, the Joyce family filed a lawsuit against DOC. They amended their complaint on February 1, 2000, alleging negligent community supervision, outrage, willful and wanton misconduct, negligent infliction of emotional distress, and negligent supervision of employees.

DOC moved for summary judgment. In its motion, DOC argued that the Joyce family could not present admissible facts to show that an act or omission by DOC was the proximate cause of the fatal accident. DOC also argued that it did not owe Paula Joyce a duty.

The Joyce family filed a cross motion for partial summary judgment, arguing that DOC could not allocate fault to Stewart's mental health providers. The Joyce family argued that DOC had no evidence to support medical malpractice claims against Stewart's doctors or the hospitals that cared for him.

The trial court denied DOC's motion based on the existence of material facts for the jury. It granted the Joyce family's motion. The matter was tried to a jury. At the close of trial, the court denied DOC's CR 50 motion to dismiss based on a lack of evidence to support a finding of duty or proximate cause.

The jury awarded the Joyce family $22,453,645.[3] The trial court denied DOC's motion for judgment as a matter of law and for remittitur or a new trial. DOC appeals.

## ANALYSIS

### Denial of Motion to Dismiss as a Matter of Law

#### *Standard of Review*

■ DOC first contends that the trial court erred in denying its motion to dismiss as a matter of law. When reviewing a trial court's decision on a motion for judgment as a matter of law, we apply the same standard as the trial court. *Esparza v. Skyreach Equip., Inc.*, 103 Wn. App. 916, 926, 15 P.3d 188 (2000), *review denied*, 144 Wn.2d 1004 (2001).

Judgment as a matter of law may be granted at the close of a plaintiff's case if the plaintiff has been "fully heard" and "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for that party." CR 50(a)(1). The court must view all conflicting evidence in the light most favorable to the nonmoving party and determine whether the proffered result is the only reasonable conclusion. *Esparza*, 103 Wn. App. at 927 (citing *Hollmann v. Corcoran*, 89 Wn. App. 323, 331, 949 P.2d 386 (1997)).

#### *Scope of Duty*

■ Proof of negligence requires that the defendant owe a duty to the plaintiff, that the defendant breach that duty, and that the breach is the proximate cause of injuries to the plaintiff. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). The existence of a duty is the threshold question in negligence analysis. *Folsom v. Burger King*, 135

---

[3] The jury awarded economic damages of $793,390 as the present value of Paula Joyce's lifetime earnings; $437,500 as the present value of loss of her family services; and $222,755 as the present value of Stephen Joyce's income lost in caring for his minor children. The jury further awarded noneconomic damages of $3,000,000 to Stephen Joyce and $18,000,000 to the four Joyce children.

Wn.2d 658, 671, 958 P.2d 301 (1998). Here, the existence of a duty is not at issue. Our Supreme Court has held that "[DOC] has a duty to take reasonable precautions to protect against reasonably foreseeable dangers posed by the dangerous propensities of [offenders], and that if injury to [the plaintiff] was a reasonably foreseeable consequence of paroling [the offender], then this duty extend[s] to [the plaintiffs]."[4] *Taggart v. State*, 118 Wn.2d 195, 217, 822 P.2d 243 (1992); *see also Bell v. State*, 147 Wn.2d 166, 52 P.3d 503 (2002).[5]

DOC argues, however, that even if it owed a duty of care, the facts do not support a finding that the duty reached to Paula Joyce. Our Supreme Court has held that "the scope of this duty is not limited to readily identifiable victims." *Taggart*, 118 Wn.2d at 219. Instead, the class of potential plaintiffs broadly "includes anyone foreseeably endangered" by the parolee. *Taggart*, 118 Wn.2d at 219 (citing *Petersen v. State*, 100 Wn.2d 421, 429, 671 P.2d 230 (1983)). This " '[f]oreseeability is normally an issue for the jury, but it will be decided as a matter of law where reasonable minds cannot differ.' " *Taggart*, 118 Wn.2d at 224 (quoting *Christen v. Lee*, 113 Wn.2d 479, 492, 780 P.2d 1307 (1989)).[6]

---

[4] *Bishop v. Miche*, 137 Wn.2d 518, 525, 973 P.2d 465 (1999) (control exerted by county probation officer over offender under community supervision similar to control parole officer exerts over probationer); *State v. Parramore*, 53 Wn. App. 527, 529, 768 P.2d 530 (1989) (" 'community supervision is the functional equivalent of probation' " (quoting former RCW 9.94A.030(4) (1988)). *See also* note 12, *infra*.

[5] In *Bell*, our Supreme Court held: "A plaintiff in a negligent parole supervision action must show not only inadequate supervision, but must also carry the burden to demonstrate the damage sustained by the plaintiff would have been avoided but for the inadequate supervision. This is a fact question properly presented to the jury." *Bell*, 147 Wn.2d at 179.

[6] In *Taggart*, our Supreme Court defined its intended class of plaintiffs for claims of negligent supervision of offenders by the broad criterion of what a jury determines is foreseeable. *Taggart*, 118 Wn.2d at 224. This differs from the traditional negligence analysis. *See, e.g., Tae Kim v. Budget Rent A Car Sys.*, 143 Wn.2d 190, 195, 15 P.3d 1283 (2001) ("The existence of duty is a question of law."); *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 475 n.3, 951 P.2d 749 (1998) ("Only after the court defines the protected class will the jury then determine whether the injury to the plaintiff was foreseeable.").

Thus, to survive judgment as a matter of law on whether the scope of the duty extended to Paula Joyce, the Joyce family had to produce evidence that would allow a jury to find that Paula Joyce was foreseeably endangered. CR 50; *Taggart*, 118 Wn.2d at 224. The Joyce family met this burden. While under supervision, Stewart's reporting record was continually unreliable. He completely failed to fulfill his court ordered supervision requirements. He violated the court's order to release his medical records to Lo. His mental health problems caused his behavior to be erratic and violent, his perception of reality to shift, and his judgment to be nonexistent to poor. Finally, while under community supervision, he was convicted of possession of stolen property after being pulled over for speeding in a stolen vehicle.

This is sufficient evidence for a jury to find it foreseeable that Stewart would continue to exercise poor or no judgment, continue to break the law, drive without a valid license, and potentially endanger the lives of others. Thus, any other person on the road with Stewart, including Paula Joyce, was "foreseeably endangered."

Nevertheless, DOC asks us to articulate another legal requirement for the *Taggart* duty to extend to the plaintiff. DOC maintains that it is possible for a jury to find foreseeability only if the trial court first determines that there is a sufficiently close factual nexus between the offender's underlying crime and the new harm that he or she caused the plaintiff. DOC contends that this nexus is missing here. Therefore, DOC argues, its duty to supervise Stewart did not extend to Paula Joyce, as a matter of law. We disagree.

The law does not require a factual nexus between the crime for which the offender was sentenced and the harm he caused the plaintiff before sending the question to the jury. Although it is true that *Taggart* and its progeny usually involve a relatively close factual nexus between the offender's prior criminal history and the crime that injured the plaintiffs, they do not require one. *See Taggart*, 118 Wn.2d at 224-25 (two offenders were on parole for assault

while under the influence of drugs or alcohol when they assaulted their victims while under the influence of drugs or alcohol); *see also Bell*, 147 Wn.2d at 170 (paroled sex offender committed kidnap and rape); *Hertog*, 138 Wn.2d 265 (previous sex offender committed rape); *Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465 (1999) (offender on probation for driving under the influence of alcohol when he drove while intoxicated and caused the accident which killed the plaintiffs' child); *Savage v. State*, 127 Wn.2d 434, 899 P.2d 1270 (1995) (previous sex offender committed a rape). *But see Couch v. Dep't of Corr.*, 113 Wn. App. 556, 568-69, 54 P.3d 197 (2002) (legal financial obligation collection scheme does not impose on DOC a duty to prevent a defendant's future crimes).[7]

To support its argument, DOC asserts that *Taggart* focuses on the defendant's propensities that related to the crime and parole conditions. DOC cites cases decided before *Taggart* for the proposition that a duty based on an offender's propensity requires a close relationship between the prior conduct that caused the supervision and the incident creating liability.

In *Baumgart v. Grant County*, 50 Wn. App. 671, 676, 750 P.2d 271, *review denied*, 110 Wn.2d 1033 (1988), the holding relied on finding no special relationship between the government and a released offender. *Taggart*, a later case from a higher court, directly contradicts this. *Taggart*, 118 Wn.2d at 223-24 (DOC has a special relationship with offenders on parole (or under community supervision) as a matter of law because they "take charge"[8] of an offender, even in the

---

[7] *Couch* is distinguished from this case. In *Couch*, the defendant, Davis, murdered Couch while under community supervision for payment of a legal financial obligation, imposed for a prior criminal conviction. There, the dispositive issue was whether, under those conditions of community supervision, DOC owed Couch a duty of care to monitor Davis's criminal behavior. We reversed because RCW 9.94A.760 (formerly RCW 9.94A.145, *recodified by* Laws of 2001, ch. 10, § 6) expressly narrows DOC's scope of community supervision to monitoring Couch's compliance with the legal financial obligation and nothing more. *Couch*, 113 Wn. App. 556.

[8] The *Taggart* court held that parole officers "take charge" of a parolee because they

absence of a custodial relationship or continual hourly control). Thus, *Taggart* overrules *Baumgart*.

DOC also relies on *Noonan v. State*, 53 Wn. App. 558, 769 P.2d 313, *review denied*, 112 Wn.2d 1027 (1989). *Noonan* declined to extend the duty found in the relationship between a psychiatrist and his patient in *Petersen* to situations in which an alcohol rehabilitation center had taken charge of a parolee. *Noonan*, 53 Wn. App. at 566 (citing *Petersen*, 100 Wn.2d 421). But *Taggart*, which, as described above, specifically adopted the *Petersen* analysis to establish a duty between DOC and a parolee, has overruled this reasoning.

DOC also relies on *Johnson v. State*, 68 Wn. App. 294, 841 P.2d 1254 (1992), *review denied*, 121 Wn.2d 1018 (1993). *Johnson* involved a parolee mistakenly released by the county, who, instead of being transferred to a drug rehabilitation center, drove while intoxicated and killed Timothy Johnson. *Johnson*, 68 Wn. App. at 295-96. *Johnson* was decided after *Taggart* and attempts to distinguish *Taggart* by stating that in the case before it "there is no evidence beyond the fact of incarceration which would support an inference that the type of definite and continuing relationship contemplated in *Petersen* existed" between the county and the parolee. *Johnson*, 68 Wn. App. at 298.

*Johnson* appears to misconstrue *Taggart*.[9] *Taggart* held that, regardless of the specific facts of the case, "the relationship between a parole officer and the parolees he or she supervises creates a similar duty" for DOC to that found in *Petersen*. *Taggart*, 118 Wn.2d at 219. *Taggart*

---

regulate a parolee's movements within the state, require the parolee to report to a parole officer, impose special conditions such as refraining from using alcohol or undergoing drug rehabilitation or psychiatric treatment, and order the parolee not to possess firearms. The parole officer is the person through whom [DOC] ensures that the parolee obeys the terms of his or her parole. Additionally, parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress during parole.

*Taggart*, 118 Wn.2d at 220.

[9] Moreover, *Johnson* is a Division One case. Thus, it is merely persuasive authority and not binding on us.

established that a parole officer takes charge of the parolees he or she supervises as a matter of law. *Taggart*, 118 Wn.2d at 223-24. As explained above, the fact dependent section of the *Taggart* analysis is the scope of the duty, which is based on foreseeability and is a jury question. *Taggart*, 118 Wn.2d at 224. DOC's reliance on *Johnson* here is thus misplaced.

DOC also cites *McKenna v. Edwards*, 65 Wn. App. 905, 830 P.2d 385, *review denied*, 120 Wn.2d 1003 (1992), as an example of a case in which a court found the government did not have a duty to control an offender's conduct. But *McKenna* does not apply here. The *McKenna* court held that there was no special relationship because the offender had not been convicted and was thus entitled to the presumption of innocence and release under the least restrictive of conditions. *McKenna*, 65 Wn. App. at 916. But in *Taggart*, as in the present case, the offenders were convicted criminals under state supervision without the presumption of innocence or the right to be free. *Taggart*, 118 Wn.2d at 199-201; *United States v. Salerno*, 481 U.S. 739, 750, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

Thus, DOC cites no authority requiring a trial court to find a close factual nexus before submitting the matter of foreseeability to a jury. It is true that foreseeability will be decided as a matter of law in a case in which reasonable minds cannot differ. *Taggart*, 118 Wn.2d at 224. But this is not such a case. Because reasonable minds could differ on whether DOC should have foreseen Stewart injuring someone such as Paula Joyce, the question properly went to the jury. *Bell*, 147 Wn.2d at 179 (foreseeability of harm from inadequate supervision is fact question for jury).

### Proximate Cause

 DOC further argues that the Joyce family did not present evidence proving that DOC's failure to supervise Stewart was the proximate cause of the accident that killed Paula Joyce. Proximate cause has two requirements: cause in fact and legal causation. *Taggart*, 118 Wn.2d at 225-26

(citing *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)).

## Legal Causation

DOC argues that the connection between Stewart's violations of his supervision and the accident that killed Paula Joyce is too attenuated to support legal causation. Legal causation "rests on considerations of policy and common sense as to how far the defendant's responsibility for the consequences of its action should extend." *Taggart*, 118 Wn.2d at 226 (citing *Hartley*, 103 Wn.2d at 779). Sometimes legal causation is so intertwined with duty that the former can be answered by deciding the latter. *Taggart*, 118 Wn.2d at 226.

Finding a duty does not automatically satisfy the legal causation requirement. *Hertog*, 138 Wn.2d at 284. But "[w]here a special relation exists based upon taking charge of the third party, the ability and duty to control the third party indicate that defendant's actions in failing to meet that duty are not too remote to impose liability." *Hertog*, 138 Wn.2d at 284. Such is the case here.

Furthermore, our Supreme Court found a clear public policy for imposing liability on DOC for lax supervision of offenders. *Taggart*, 118 Wn.2d at 224 (protecting others from reasonably foreseeable dangers is a policy behind supervision of offenders). Thus, we need go no further to determine that legal causation exists here.

## Cause in Fact

Cause in fact is met when the harm suffered would not have occurred but for an act or omission of the defendant. There must be a direct, unbroken sequence of events that links the actions of the defendant and the injury to the plaintiff. *Taggart*, 118 Wn.2d at 226. Cause in fact is usually a question for the jury, but, if the causal connection is so speculative and indirect that reasonable minds could

not differ, it may be determined as a matter of law. *See Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985); *Whitchurch v. McBride*, 63 Wn. App. 272, 277, 818 P.2d 622 (1991), *review denied*, 118 Wn.2d 1029 (1992).

■ ■ DOC asserts that, as a matter of law, the jury could not find cause in fact because to do so requires speculation about whether Stewart would have been incarcerated on the date of the accident. DOC cites *Petersen*, 100 Wn.2d at 442, and argues that it requires the testimony of the sentencing judge on to what he or she would have sentenced the absconder. Because the Joyce family did not produce testimony of Stewart's sentencing judge, DOC argues that the evidence is insufficient to support a finding of cause in fact under *Petersen*, 100 Wn.2d 421. We disagree.

DOC construes *Petersen* too narrowly. Rather than requiring testimony of the sentencing judge as to whether he or she would have sentenced the absconder, the *Petersen* court held that "[a] trial court does not abuse its discretion by allowing a party to propose a hypothetical question based solely on that party's theory of the case or to include disputed facts." *Petersen*, 100 Wn.2d at 442. In *Petersen*, the court held that the trial court did not abuse its discretion in allowing expert testimony, rather than testimony of the trial judge. Thus, *Petersen* does not require testimony from a trial judge. Therefore, *Petersen* does not support DOC's argument.

Also, we note that William Stough, the Joyce family's expert and a former CCO, did not speculate as to what a trial court would have done. Rather, he testified as to what a reasonable CCO would have done "based on material facts established by the record." *Petersen*, 110 Wn.2d at 442. He testified that, on a more probable than not basis, a reasonable CCO would have noted Stewart's violations before the accident that killed Paula Joyce. He testified only as to "what would have occurred had the CCOs properly done their jobs." 8 CP at 1340.

Finally, our Supreme Court upheld cause in fact in *Taggart* on a fact pattern similar to the present case. *Taggart*, 118 Wn.2d at 227. The court held that

> a reasonable jury might conclude that if the Washington officials had issued the parole warrant the day they received the teletype from the Montana authorities informing them that Montana police were standing by to arrest [the offender], [the victim] never would have been raped. Similarly, the jury might conclude that if the Washington officials had responded to that teletype by telling the Montana police that no parole warrant would be issued, then the Montana police would have arrested [the offender] immediately on the outstanding [Montana] misdemeanor violation, in which case, again, [the victim's] injury would have been avoided.

*Taggart*, 118 Wn.2d at 227.

▮ Although cause in fact requires a direct, unbroken sequence of events to link the acts or omission of DOC to Paula Joyce's death, the standard of review requires us only to ascertain evidence that would allow a jury to make that finding. *Daugert*, 104 Wn.2d at 257. Here, there was sufficient evidence at trial for a jury to find cause in fact. It is undisputed that Stewart committed numerous violations of his supervision that were not reported. And a court had previously sentenced Stewart to 39 days of jail time for violations. Stough testified that if DOC had obtained a bench warrant for Stewart prior to the accident, he "would have been in jail, either awaiting a hearing or doing time on the violations" without bail on August 8, 1997. 5 Report of Proceedings (RP) at 792. This testimony was based on facts established in the record. Therefore, the trial court did not err in denying DOC's motion to dismiss as a matter of law.

## Allocation of Fault

DOC argues that it should have been allowed to attribute fault for Paula Joyce's death to Stewart's mental health providers based on the 1986 tort reform act.[10] It maintains

---

[10] RCW 4.22.070.

that the trial court erred when it granted the Joyce family's pretrial motion to exclude this argument.

▆▆▆ The trial court properly dismissed DOC's claim of allocation to Stewart's mental health care providers. A party fails to claim its right to allocate fault by not producing evidence of fault of the other party. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 25, 864 P.2d 921 (1993). And a judge cannot submit the issue of allocation to a jury without evidence of another party's fault. *Adcox*, 123 Wn.2d at 25.

▆▆▆ In a medical negligence action, expert testimony is required to establish the standard of care and most aspects of causation. *Seybold v. Neu*, 105 Wn. App. 666, 676-77, 19 P.3d 1068 (2001). To prevail on summary judgment, DOC would have had to "produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care." *Seybold*, 105 Wn. App. at 676 (citing RCW 7.70.040 and *McKee v. Am. Home Prods. Corp.*, 113 Wn.2d 701, 706-07, 782 P.2d 1045 (1989)).

Here, DOC did not submit any such evidence. The trial court properly granted the Joyce family's motion on this matter.[11]

## Jury Instructions

DOC contends that the trial court erred in instructing the jury. It assigns error to five instructions.

▆▆▆ Jury instructions are sufficient if they (1) permit the party to argue his or her theory of the case; (2) are not misleading; and (3) when read as a whole, correctly inform the jury of the applicable law. *Hue v. Farmboy Spray Co.*, 127 Wn.2d 67, 92, 896 P.2d 682 (1995). The trial court has

---

[11] DOC cites *Petersen* to support its argument. But *Petersen* precedes *Adcox*, which held that allocation of fault requires that either the plaintiff or the defendant present evidence of another entity's fault to invoke allocation. *Adcox*, 123 Wn.2d at 25. "Without a claim that more than one party is at fault, and sufficient evidence to support that claim, the trial judge cannot submit the issue of allocation to the jury." *Adcox*, 123 Wn.2d at 25.

considerable discretion regarding the wording of instructions and how many instructions are necessary to present each litigant's theories fairly, and we review these matters for an abuse of discretion. *State v. Reay*, 61 Wn. App. 141, 146-47, 810 P.2d 512, *review denied*, 117 Wn.2d 1012 (1991). But we review claimed errors of law in jury instructions de novo. *Hue*, 127 Wn.2d at 92.

## Instruction 16

DOC asserts that instruction 16 did not correctly set forth the duty that CCOs owe to report violations and that it was an improper comment on the evidence.

Instruction 16 reads: "The Department of Corrections, through its community corrections officers, is legally responsible for reporting violations of any conditions of community supervision to the Superior Court which sentenced the felon and must take action within 30 days of learning of a violation." 11 CP at 2044.

This instruction was based on a DOC directive, which reads, in relevant part,

> CCOs are legally responsible for reporting violations to the court. CCOs are to take action when they learn an offender[ ] has violated conditions of supervision. . . . Action must be taken within the following time frames, which begin when the violation becomes known to the officer: . . . within thirty (30) calendar days for non [Correctional Industries] cases.

DOC Division of Community Corrections Division Directive 200.700 (Feb. 28, 1995).

██ ██ Although our legislature abrogated negligence per se under the tort reform act of 1986, disregard of an administrative rule may be considered by a jury as evidence of negligence. LAWS OF 1986, ch. 305, §§ 100-912. *See* RCW 5.40.050 ("A breach of a duty imposed by statute, ordinance, or administrative rule . . . may be considered by the trier of fact as evidence of negligence."); *Melville v. State*, 115 Wn.2d 34, 39, 793 P.2d 952 (1990); *see also, e.g., Nat'l Union Ins. Co. v. Puget Sound Power & Light*, 94 Wn. App. 163,

179, 972 P.2d 481, *review denied*, 138 Wn.2d 1010 (1999). The question here is whether a directive functions as the equivalent of an administrative rule.

In *Kelley*, we discussed the scope and purpose of DOC directives. *Kelley v. Dep't of Corr.*, 104 Wn. App. 328, 334-35, 17 P.3d 1189 (2000), *review granted*, 144 Wn.2d 1021 (2001). DOC's written directives set procedures and requirements to be followed by CCOs in supervising offenders. These directives require CCOs to "enforce all conditions and requirements imposed by the court . . . or Department of Corrections," and to report an offender to the court if he or she fails to comply with any conditions or requirements of supervision. *Kelley*, 104 Wn. App. at 334. CCOs are to investigate and report whenever an offender fails to keep a scheduled appointment or is determined to be absent from an approved location. Thus, breach of a directive may be considered as evidence of negligence and instruction 16 accurately states the law.

 DOC also asserts that instruction 16 implies that DOC has no discretion to determine whether to arrest an offender, which misstates the law. We disagree. As held in *Bishop*, 137 Wn.2d at 526, probation officers have a legal obligation to report violations.[12] Therefore, DOC's arguments as to instruction 16 fail.

### Instruction 20

DOC next argues that instruction 20 is an incorrect statement of the law. DOC further asserts that including the phrase "presenting a danger to the community" creates an arbitrary standard and violates Stewart's constitutional

---

[12] The dissent asserts that an offender on community supervision is not comparable to a pre-Sentencing Reform Act of 1981, chapter 9.94A RCW, probationer, implying that *Taggart* and *Bell* do not apply here. We disagree. It is proper to compare a probation officer with a community corrections officer. RCW 9.92.060(1) ("the superior court may . . . [order] that the sentenced person be placed under the charge of a community corrections officer employed by the department of corrections, or if the county elects to assume responsibility for the supervision of all superior court misdemeanant probationers a probation officer employed or contracted for by the county, upon such terms as the superior court may determine"). *See also* note 4, *supra*.

rights under *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).[13]

In excepting to instruction 20, DOC argued "[instruction 20] fails to take into consideration other factors, such as the authority to [sic][14] statutory and constitutional protections, as well as, once again, focusing on the—making a comment on the evidence that's already in place." 10 RP at 1493.

We assume DOC was referring to its earlier exception to instruction 18, where it argued, "[I]t's similar to 16, 19, 20. It's the same thing that . . . I believe it ends up being a comment on the evidence. It improperly focuses on specific issues. Even if it is a correct statement of the law, that doesn't mean that it should be given. We have, the evidence is in as to these items, and I believe it would be misleading." 10 RP at 1491. DOC's argument that these instructions are incorrect comments on the evidence appears to be based on its assertion that DOC directives are not "law" and therefore cannot be the basis for a jury instruction. *See, e.g.*, 10 RP at 1490, 1491. As previously discussed, we disagree. *See supra* at 596-97.

The relevant part of instruction 20 states: "A community corrections officer may arrest or cause the arrest of an offender, without a warrant, when an offender violates any condition or requirement of a sentence or when the offender presents a danger to the community." 11 CP at 2048.

■■ A review of the record discloses that DOC was not specific when taking exception to instruction 20. Under CR 51(f), "[t]he objector shall state distinctly the matter to

---

[13] The dissent also asserts that this instruction violates Washington's constitution, article I, section 7. We disagree. Contrary to DOC's argument, the protections under *Morrissey* are present in former RCW 9.94A.207 (1996). Under *Morrissey*, the Court held that an informal hearing, held after arrest, to confirm the propriety of arrest of a parolee does not violate constitutional protections, and the dissent cites no authority for the proposition that article I, section 7 of the Washington *Constitution* provides greater protection than the United States Constitution in this context.

[14] We quote the transcript as written, but there appears to be a word or two missing.

which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made." *See also Trueax v. Ernst Home Ctr., Inc.*, 124 Wn.2d 334, 878 P.2d 1208 (1994) (an objection to jury instructions must reasonably identify the statute or the constitutional provision that underlies the basis for the challenge).

DOC noted that it was objecting to instruction 20 and referred to the fact that the instruction failed to take into consideration other factors such as the "statutory and constitutional protections." 10 RP at 1493. But this statement did not reference the specific part of the instruction it objected to and did not identify the precise constitutional or statutory protections that would invalidate the instruction. Because this objection was not properly raised below, we do not address it here.

*Instructions 5 and 13*

■■■ DOC next argues that instructions 5 and 13 erroneously instructed the jury on negligent training, supervision, and hiring of an employee. DOC asserts that this is reversible error because the jury was already instructed that DOC was responsible for the acts and omission of its employees in instruction 14. We disagree. At the most, asserting claims of both vicarious liability and negligent supervision is redundant.[15] *Gilliam v. Dep't of Soc. & Health Servs.*, 89 Wn. App. 569, 585, 950 P.2d 20, *review denied*, 135 Wn.2d 1015 (1998). Therefore, any error in giving these instructions is harmless.

---

[15] Our use of the term "redundant" is comparable to its use in *Gilliam*, where the court held that claims of negligent investigation and negligent supervision were redundant because the State conceded that the defendant was acting within the scope of her employment and that the State would therefore be vicariously liable for her conduct. The court held that "[u]nder these circumstances a cause of action for negligent supervision is redundant." *Gilliam*, 89 Wn. App. at 585.

*Instruction 7*

DOC finally argues that instruction 7 was given in error because it misstated the law. That instruction tells the jury:

> The plaintiffs, the Joyce family, have the burden of proving *each* of the following propositions:
>
> First, that the defendant acted, or failed to act, in one of the ways claimed by the plaintiffs and that in so acting, or failing to act, the defendant was negligent;
>
> Second, that the plaintiffs were injured;
>
> Third, that the negligence of the defendant was the proximate cause of the injury to the Plaintiffs.
>
> If you find from your consideration of all the evidence *one or more* of these propositions has been proved against the defendant, your verdict should be for the plaintiffs and against that defendant. On the other hand, if *any* of these propositions has not been proven against the defendant, your verdict should be for the defendant.

11 CP at 2035 (emphasis added).

DOC asserts that, because this instruction allows the jury to find for the plaintiff if *one or more* propositions instead of *each* proposition have been proved, this is reversible error. For support, DOC cites *Donner v. Donner*, 46 Wn.2d 130, 278 P.2d 780 (1955). That case holds that it is reversible error "to give an instruction which purports to contain all of the elements necessary for a verdict for either party," but is contradictory. *Donner*, 46 Wn.2d at 134.

The Joyce family acknowledges the "one or more" language as a clerical error.[16] Nevertheless, DOC did not object to this instruction.

 A party waives objections to errors in a jury instruction if he or she fails to voice such objections to the trial court. *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 96, 549 P.2d 483 (1976). The failure to object before the

---

[16] According to the Joyce family, the phrase "one or more" should have modified "defendants." Instead, it was misplaced and modified "of these propositions." Resp't's Br. at 46 n.19.

jury is instructed in order to enable the trial court to avoid error violates CR 51(f). *Peterson v. Littlejohn*, 56 Wn. App. 1, 11, 781 P.2d 1329 (1989). Therefore, we do not address this issue here. *See Estate of Ryder v. Kelly-Springfield Tire Co.*, 91 Wn.2d 111, 114, 587 P.2d 160 (1978) (where exception is not taken, the alleged error will not be considered on appeal); *see also Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 244-45, 728 P.2d 585 (1986).

## Evidentiary Rulings

DOC also assigns error to the trial court's evidentiary rulings. A trial court has broad discretion in admitting evidence. *State v. Dennison*, 115 Wn.2d 609, 628, 801 P.2d 193 (1990). We will not overturn that decision absent an abuse of discretion. A court abuses its discretion if a decision is manifestly unreasonable or is based on untenable grounds. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 168, 876 P.2d 435 (1994).

### Admitting Evidence of Stewart's 1993 Accident

DOC argues that the trial court erred in admitting the police report of a 1993 accident in which Stewart was involved. DOC asserts that this was irrelevant to the present case because it did not result in a conviction and the duty in *Taggart* does not extend to controlling conduct for which the offender is not specifically under community supervision. This is merely a reiteration of DOC's argument above, that a close factual nexus is required. We previously addressed this argument. *See Scope of Duty*, *supra*, at 586-87.

### Not Admitting Evidence on Reasonable Departure from Departmental Directives

DOC argues that the trial court erred when it precluded DOC from raising the issue of reasonable departures from departmental directives. But DOC mischaracterizes the trial court's ruling. The trial court did not bar DOC from

explaining why departure from departmental directives is sometimes reasonable; it merely required DOC to request permission to do so. This argument fails.

### Admitting Testimony on CCO's Knowledge of Stewart's Mental Health Condition

DOC contends that the trial court erred in allowing Stough, a former corrections officer, to testify regarding Stewart's mental health records because Stough was not a mental health professional. Our review of the record discloses that Stough testified only within the area of his expertise: the duties and performance of corrections officers. He testified that he had had some training as a CCO in mental health issues and that knowledge of Stewart's mental problems would be important for a CCO to have.[17] He also testified as to how a CCO should interpret Stewart's mental health records. The trial court did not abuse its broad discretion in allowing the testimony.

### Admitting Testimony on Violation Reports

DOC contends that Stough was not qualified to testify about how courts treat violation reports. In so arguing, DOC misconstrues Stough's opinion. Here, the trial court limited Stough's testimony to "what would have occurred had the CCOs properly done their jobs" rather than how a court would treat Stewart's violations. 8 CP at 1340. The trial court was satisfied that Stough's experience as a DOC correctional officer and supervisor qualified him to so testify. The trial court did not abuse its discretion in allowing this limited testimony.

---

[17] Of significance, there were two instances where Stewart's CCOs were notified that they should monitor Stewart's mental health. First, when a mental health officer noted that Stewart needed further evaluation. And second, when a King County judge ordered Stewart to release his mental health records to his CCO.

Improper Argument and Verdict Amount

█ DOC further contends that statements made by counsel for the Joyce family during closing argument were improper. But DOC made no objections during the family's closing argument. Therefore, any error was not preserved for appeal. *See Kain v. Logan*, 79 Wn.2d 524, 528, 487 P.2d 1292 (1971) (remarks during closing arguments believed to be prejudicial must be brought to the trial court's attention).

█ DOC finally argues that the amount of the verdict was excessive. A verdict will be overturned only if it is " 'flagrantly outrageous and extravagant' " and " ' "shocks the conscience of the court." ' " *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 269, 840 P.2d 860 (1992) (quoting *Bingaman v. Grays Harbor Cmty. Hosp.*, 103 Wn.2d 831, 835-37, 699 P.2d 1230 (1985)).

█ DOC makes comparisons with other jury verdicts. It is well settled that it is inappropriate to compare verdicts. *Adcox*, 123 Wn.2d at 33 (citing *Washburn*, 120 Wn.2d at 268 (improper to assess the amount of a verdict based upon comparisons with other verdicts)). This argument fails. Finally, DOC does not raise any credible argument that the jury's award requires us to use this rarely exercised power to overturn a jury's determination of noneconomic damages.

Affirmed.

ARMSTRONG, J., concurs.

QUINN-BRINTNALL, A.C.J. (dissenting) — In this case a jury was asked to assign responsibility for the tragic death of Paula Joyce, a much beloved wife and mother, who was killed when Vernon Valdez Stewart, an offender on community supervision, drove a stolen car through a stoplight and collided with Joyce's car. The jury found the Department of Corrections (DOC) responsible for failing to adequately supervise Stewart and awarded Joyce's family $22,453,645 for their terrible loss. The majority would affirm the verdict

and the damage award. Because the court improperly instructed the jury that DOC had a duty to ensure that Stewart maintained law-abiding behavior, because the only evidence that DOC's supervision caused Joyce's death came from inadmissible speculative testimony, and because the trial judge misinstructed the jury on the law concerning DOC's authority to control Stewart, I must respectfully dissent.

The law has not established a cause of action for negligent supervision of persons on community supervision under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. *Compare Bell v. State*, 147 Wn.2d 166, 52 P.3d 503 (2002); *Taggart v. State*, 118 Wn.2d 195, 822 P.2d 243 (1992); *and Couch v. Dep't of Corr.*, 113 Wn. App. 556, 571, 54 P.3d 197 (2002). Additionally, unless the sentencing court utilizes the "first-time offender" waiver provisions of the SRA, an offender cannot be required to maintain law-abiding behavior as a condition of community supervision.[18] *See State v. Barclay*, 51 Wn. App. 404, 753 P.2d 1015, *review denied*, 111 Wn.2d 1010 (1988).

Therefore, DOC lacks authority to monitor or enforce a "maintain law-abiding behavior" condition in the absence of a first-time offender waiver. *Couch*, 113 Wn. App. at 565 (explaining that a community corrections officer (CCO) must have a court order before he or she can "take charge" of an offender, "and even when he or she has such an order, he or she can enforce it only according to its terms *and applicable statutes*" (emphasis added)).

Even if a negligent supervision claim exists in the first-time offender/community supervision context, no instruction informed the jury in this case of the appropriate legal cause standard clarified in *Bell*: "[a] plaintiff in a negligent parole supervision action must show not only inadequate supervision, but must also carry the burden to demonstrate the damage sustained by the plaintiff would have been

---

[18] DOC concedes that King County sentenced Stewart as a "first-time" offender. Stewart was eligible to be sentenced as a first-time offender, but the judgment and sentence does not reflect that the court exercised this waiver.

avoided *but for* the inadequate supervision." 147 Wn.2d at 179 (emphasis added). *See Taggart*, 118 Wn.2d at 227 (explaining that "when the connection between a defendant's conduct and the plaintiff's injury is too speculative and indirect, the cause in fact requirement is not met"); *see also Petersen v. State*, 100 Wn.2d 421, 435, 671 P.2d 230 (1983) (negligent supervision of a patient in a state hospital case, explaining that the claim of breach of duty must be a proximate cause of the resulting injury). Here, the plaintiff's causation evidence, if admissible, was insufficient to prove that the collision would have been avoided but for the inadequate supervision.

The trial court also misinstructed the jury on a CCO's authority when supervising an offender on community supervision. Specifically, instruction 16 improperly informed the jury that a CCO must take action within 30 days of learning of an intentional violation, implying that failure to do so is a violation of the law rather than of a department directive. *See Melville v. State*, 115 Wn.2d 34, 38, 793 P.2d 952 (1990). *See also* former RCW 5.40.050 (1986).[19] And instruction 20 improperly informed the jury that "[a] community corrections officer may arrest or cause the arrest of an offender, without a warrant . . . when the offender presents a danger to the community" because a CCO has no such arrest power. 11 Clerk's Papers (CP) at 2048. *See Couch*, 113 Wn. App. at 565 (explaining that a CCO must have a court order before he or she can "take charge" of an offender).

The bases for my conclusions are set forth more fully below.

---

[19] That statute provided:

> A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence; however, any breach of duty as provided by statute, ordinance, or administrative rule relating to electrical fire safety, the use of smoke alarms, or driving while under the influence of intoxicating liquor or any drug, shall be considered negligence per se.

Former RCW 5.40.050 (2000) (LAWS OF 2001, ch. 194, § 5 inserted "sterilization of needles and instruments used in tattooing or electrology as required under RCW 70.54.350.").

DOC'S Duty To Supervise an Offender on
Community Supervision

The majority holds that

> the existence of a duty is not at issue. Our Supreme Court has
> held that "[DOC] has a duty to take reasonable precautions to
> protect against reasonably foreseeable dangers posed by the
> dangerous propensities of [offenders], and that if injury to [the
> plaintiff] was a reasonably foreseeable consequence of paroling
> [the offender], then this duty extend[s] to [the plaintiffs]."
> *Taggart v. State*, 118 Wn.2d 195, 217, 822 P.2d 243 (1992); *see
> also Bell v. State*, 147 Wn.2d 166, 52 P.3d 503 (2002).

Majority at 587 (footnote omitted). I respectfully disagree
with the majority's reliance on *Taggart* and *Bell*. In those
cases, each offender had a documented history of dangerous
predatory sexual behavior. Neither offender was a first-
time offender or on community supervision under the SRA.
More importantly, both *Taggart* and *Bell* addressed the
monitoring of sexual predators on parole who sexually
assaulted Taggart and Bell.

A convicted offender paroled by the parole board or
indeterminate sentencing review board is granted the privi-
lege of (1) suspension of a portion of the previously imposed
term of confinement and (2) release on conditions. If a
parolee's parole is revoked by the indeterminate sentencing
review board (formerly the parole board), he is returned to
prison to serve the remaining balance of his term of
confinement.[20] In contrast, the term of confinement of an
individual on community supervision under the SRA *has
already been served*.

In *Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465 (1999),
our Supreme Court equated parole and district court pro-
bation:

> The Court of Appeals reasoned that probation officers exert
> control over probationers similar to that exercised by parole

---

[20] *See Couch*, 113 Wn. App. at 566 n.35, citing RCW 9.95.120, implying that
parole may be revoked without hearing if parolee is convicted of committing a new
offense. In contrast an adversarial hearing must be held before further punish-
ment may be imposed on a person under community supervision.

officers over parolees, and accordingly the duty identified in *Taggart* also applies to county probation officers. We agree. The duty identified in *Taggart* may be found where a probation officer must monitor probationers for compliance with conditions of *parole*.

*Bishop*, 137 Wn.2d at 525 (emphasis added).

*Bishop* explained that a parole officer must exercise reasonable care in supervising a parolee due to the special relationship between a parole officer and a parolee:

> in *Taggart* . . . we held that the state may be liable for the negligence of a parole officer who fails to use reasonable care in supervising a parolee whose dangerous propensities pose a reasonably foreseeable danger to others. In *Taggart*, we acknowledged the rule that generally one has no duty to prevent a third party from causing harm to another. We also recognized, however, the exception stated in RESTATEMENT (SECOND) OF TORTS § 315 (1965) which provides that there may be such a duty where there is a special relation between the actor and the third person. Such a special relation exists when one takes charge of a third person whom he or she knows or should know is likely to cause bodily harm to another if not controlled, and the actor has a duty to control the third party to prevent him or her from doing such harm.

*Bishop*, 137 Wn.2d at 524.

A special "take charge" relationship of the sort that gives rise to the duty to supervise and control future criminal conduct may well exist in a parole (*Taggart*) or suspended sentence probation (*Bishop*) situation where, but for the offender's release, the convicted person would be incarcerated, serving the remainder of his sentence. But, as a general rule, a person sentenced under the SRA to community supervision has served his term and is entitled to be free from incarceration pending a judicial officer's finding of a violation and entry of a separate order of confinement made following an adversarial hearing.[21] Moreover, even

---

[21] *See, e.g., Couch*, 113 Wn. App. at 569 (DOC not authorized to intervene in offender's activities not mentioned in sentencing documents); *State v. Raines*, 83 Wn. App. 312, 316, 922 P.2d 100 (1996) (court exceeded authority by imposing a

with a violation finding, incarceration is not the only available penalty.[22]

Here, the majority holds that the plaintiffs proved that "Stewart would continue to exercise poor or no judgment, continue to break the law, drive without a valid license, and potentially endanger the lives of others." Majority at 588. While I agree that Stewart's abysmal compliance with the terms of his community supervision supports such a statement, the SRA and its underlying policy do not give DOC "take charge" authority over Stewart.[23]

A CCO may effect or cause the arrest of an offender without a warrant when an offender violates any condition

---

requirement to obey all laws as a condition of offender's community placement and could not sanction offender for alcohol consumption not prohibited in initial order).

[22] RCW 9.94A.634(3) (formerly 9.94A.200; *see* Laws of 2001, ch. 10, § 6) states:

If an offender fails to comply with any of the requirements or conditions of a sentence the following provisions apply:

(a)(i) Following the violation, if the offender and the department make a stipulated agreement, the department may impose sanctions such as work release, home detention with electronic monitoring, work crew, community restitution, inpatient treatment, daily reporting, curfew, educational or counseling sessions, supervision enhanced through electronic monitoring, jail time, or other sanctions available in the community.

. . . .

(c) The state has the burden of showing noncompliance by a preponderance of the evidence. If the court finds that the violation has occurred, it may order the offender to be confined for a period not to exceed sixty days for each violation, and may . . . (iv) order one or more of the penalties authorized in (a)(i) of this subsection.

[23] The majority also rejects DOC's argument that *Taggart* requires a factual nexus between the offender's underlying crime and the new harm that he or she caused the plaintiff. Setting aside the issue of whether *Taggart* and *Bell* require such a nexus, the SRA does have such a requirement. Unless the sentencing court invokes the "first-time offender" waiver, it may only require or prohibit the offender from engaging in activities that are related to the crime of which he has been convicted. *See* former RCW 9.94A.120(5) (1996) (specifically providing that when sentencing a first-time offender the court may waive the standard sentence range and require the offender to refrain from committing new offenses); former RCW 9.94A.030(7) (1996) (reiterating that for first-time offenders, community supervision may include conditions imposed under former RCW 9.94A.120(5)). (The first-time offender waiver was recodified as RCW 9.94A.650 in 2000. *See* Laws of 2000, ch. 28, § 18. The definition of "community supervision" no longer mentions the conditions imposed under the first-time offender waiver statute. *See* RCW 9.94A.030(9)). Thus, the nexus requirement inheres in the limitation on lawful conditions the Kittitas County court could impose under the SRA.

or requirement of a sentence pending a determination by the court. *See* RCW 9.94A.631.[24] This authority alone, however, does not create a duty to control all behavior of the person so supervised. *See, e.g., Couch*, 113 Wn. App. at 565 (holding that a CCO must have a court order before he or she can " 'take charge' " of an offender; and even when he or she has such an order, he or she can enforce it only according to its terms *and applicable statutes* (emphasis added)). *Couch* held that an obligation to monitor for legal financial obligations only does not create a duty to monitor for all purposes:

> One effect of [the modification of Davis' misdemeanor sentence] was to restrict DOC's authority over Davis. Whereas DOC previously had authority to supervise him for all purposes, including the prevention of crime, it would henceforth have authority to monitor legal financial obligations only.

*Couch*, 113 Wn. App. at 571.

In contrast to the former parole and probation statutes, one of the express purposes of the SRA was to hold offenders accountable for their criminal acts by fully prosecuting criminal conduct, rather than addressing subsequent crimes as violations of probationary supervision:

---

[24] That statute reads as follows:

If an offender violates any condition or requirement of a sentence, a community corrections officer may arrest or cause the arrest of the offender without a warrant, pending a determination by the court. If there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, an offender may be required to submit to a search and seizure of the offender's person, residence, automobile, or other personal property. A community corrections officer may also arrest an offender for any crime committed in his or her presence. The facts and circumstances of the conduct of the offender shall be reported by the community corrections officer, with recommendations, to the court.

If a community corrections officer arrests or causes the arrest of an offender under this section, the offender shall be confined and detained in the county jail of the county in which the offender was taken into custody, and the sheriff of that county shall receive and keep in the county jail, where room is available, all prisoners delivered to the jail by the community corrections officer, and such offenders shall not be released from custody on bail or personal recognizance, except upon approval of the court, pursuant to a written order.

RCW 9.94A.631 (formerly RCW 9.94A.195 (2000); *see* Laws of 2001, ch. 10, § 6).

Judges, in granting probation, have traditionally been free to impose any conditions that bear a reasonable relation to the purposes of sentencing. This power has been exercised expansively and a wide variety of affirmative conditions have commonly been required as a condition of probation by sentencing judges. With the exception of "first-time offenders" and "sex offenders," no comparable power exists under the Sentencing Reform Act. The only conditions of "community supervision" authorized are "crime-related prohibitions" and "other sentence conditions" imposed pursuant to the Act.

The most significant aspect of this limiting definition is the absence of any requirement of obeying the law as a condition of community supervision. Under the former system this requirement was a near-universal condition of probation and parole. Its rejection was intentional.

DAVID BOERNER, SENTENCING IN WASHINGTON § 4.4, at 4-4 (1985) (footnotes omitted).

If an offender violates the conditions of community supervision set forth in the judgment and sentence, he may, but need not, be arrested, and his CCO must file a violation report. *See* RCW 9.94A.631;[25] DOC Division of Community Corrections Division Directive (DCC) 200.700 (Feb. 28, 1995). But only a court has the authority to impose additional terms of confinement on an offender for violating conditions of his community supervision. *See* RCW 9.94A-.634(1)[26] (providing that when an offender violates any condition or requirement of his sentence, the court may modify the judgment and sentence and impose further punishment for the violation). And a court may do so only after conducting an adversarial hearing and finding by a preponderance of the evidence that the offender willfully violated the conditions of community supervision. *See, e.g.,* *State v. Gropper,* 76 Wn. App. 882, 885-86, 888 P.2d 1211 (1995). DOC lacked the lawful authority to require Stewart

---

[25] *See* former RCW 9.94A.195 (1984), *recodified as* RCW 9.94A.631 (LAWS OF 2001, ch. 10, § 6).

[26] *See* former RCW 9.94A.200 (1998), *recodified as* RCW 9.94A.634 (LAWS OF 2001, ch. 10, § 6).

to obey all laws. Thus, DOC did not have the duty to assure that Stewart obeyed all laws.

DOC's Supervision as a Cause in Fact

To sustain their claim for negligent supervision, the plaintiffs must demonstrate not only that the CCOs had a duty and the authority to reasonably monitor, investigate, and report Stewart's alleged violations to the King and Kittitas County courts and that they were negligent in performing that duty, but also that had DOC properly monitored, investigated, and reported his violations, Stewart would have been controlled and incarcerated on August 8, 1997. Put differently, plaintiffs had the burden to prove that DOC's failure to monitor and report Stewart's conduct was the cause in fact of Joyce's death. *Taggart*, 118 Wn.2d at 227 (explaining "that when the connection between a defendant's conduct and the plaintiff's injury is too speculative and indirect, the cause in fact requirement is not met").

The majority contends that the plaintiff's expert, William Stough, satisfied this burden when he testified that, had Stewart's CCO timely obtained a warrant and arrested Stewart, he would have been in jail on August 8, 1997.

But Stough's testimony was inadmissible. To be admissible Stough had to have either personal knowledge or expert knowledge about what would have happened if DOC had filed a violation report sooner. *State v. Kunze*, 97 Wn. App. 832, 988 P.2d 977 (1999). A person can never have personal knowledge of the outcome of a matter occurring in the future. Neither Stough nor anyone else could have had personal knowledge of the outcome of a future hearing. And there is no recognized field of experts qualified to give an opinion predicting what a judge will do at the end of a particular adversarial hearing.

Thus, Stough's testimony was purely speculative. It is just as likely that, had the CCO reported Stewart's February 26 driving violation within 30 days of its occurrence and had the trial court imposed the maximum 60-day penalty

for the violation, Stewart would have been released prior to August 8, 1997. Such testimony was purely speculative and inadmissible. Thus, it was insufficient to prove that DOC's conduct was a cause in fact of Joyce's death. *See State v. Warness*, 77 Wn. App. 636, 643, 893 P.2d 665 (1995) (explaining that expert testimony that is merely speculative is not admissible); *see also Bell*, 147 Wn.2d at 179-80 (expert testimony on legal burden of proof inadmissible).

Unlike a specific term of confinement that is suspended in a misdemeanor or pre-SRA probationary sentence or remaining in the case of parole, the penalty for a violation of community supervision is unknown. The judge in the King County domestic violence case would not necessarily have incarcerated Stewart had his CCO filed a violation for driving with a suspended license. Unlike a pre-SRA probationer, a person on community supervision has been finally sentenced for his original crime. No additional penalties may be imposed for the original crime charged. *See* BOERNER, *supra*, § 4.4, at 4-5.

Moreover, the court that sentences an offender to community supervision under the first-time offender provision of the SRA has presumptively determined that the offender has not demonstrated a dangerous propensity that poses a reasonably foreseeable danger to others. *See* RCW 9.94A.650(1).[27] Assuming that Stewart was sentenced un-

---

[27] That section explains that the first-time offender waiver applies to offenders who have never been previously convicted of a felony in this state, federal court, or another state, and who have never participated in a program of deferred prosecution for a felony, and who are convicted of a felony that is not:

 (a) Classified as a violent offense or a sex offense under this chapter;

 (b) Manufacture, delivery, or possession with intent to manufacture or deliver a controlled substance classified in Schedule I or II that is a narcotic drug or flunitrazepam classified in Schedule IV;

 (c) Manufacture, delivery, or possession with intent to deliver a methamphetamine, its salts, isomers, and salts of its isomers as defined in RCW 69.50.206(d)(2); or

 (d) The selling for profit of any controlled substance or counterfeit substance classified in Schedule I, RCW 69.50.204, except leaves and flowering tops of marihuana.

RCW 9.94A.650(1).

der the "first-time offender" waiver,[28] the King County sentencing court had the authority to require Stewart to maintain law-abiding behavior and to require DOC to monitor him for compliance with that condition.[29] But that court also necessarily found that Stewart had not demonstrated a dangerous propensity that posed a reasonably foreseeable danger to others.[30]

Ten days before the collision that took Joyce's life, Stewart's CCO filed two violation notices requesting that the King and Kittitas trial courts set hearings to review Stewart's alleged violations. In Kittitas County (possessing stolen property), the CCO alleged that Stewart had failed to report since May 2, failed to notify him before changing his address,[31] and failed to pay his legal financial obligations. In King County (domestic violence assault), the CCO alleged the same violations, as well as the further violation that Stewart was driving with a suspended driver's license on or about February 26.[32] In my view, even if the jury

At the time Stewart was sentenced, the first-time offender waiver was codified at former RCW 9.94A.030(23) (1999). It was recodified as RCW 9.94A.650 in 2000. *See* LAWS OF 2001, ch. 10, § 6.

[28] *See* majority at 597 n.12.

[29] Although the Kittitas County judgment and sentence contained the maintain law-abiding behavior clause, it was unenforceable. Stewart was not eligible for a first-time offender waiver when he was sentenced in Kittitas County. Thus, that court was precluded from requiring Stewart to maintain law-abiding behavior as a condition of his community supervision, and DOC had no lawful authority to allege that any subsequent violations of the law were also violations of his community supervision in that cause. *See State v. Barclay*, 51 Wn. App. 404, 405-06, 753 P.2d 1015, *review denied*, 111 Wn.2d 1010 (1988).

[30] DOC acknowledges that Stewart's supervision might have produced liability for DOC under *Taggart* if he had assaulted his girl friend again and the CCO had not reported violations of no contact, no weapons, or counseling conditions, which would have led to reincarceration.

[31] The report reflects that as of March 1997, DOC believed Stewart was homeless, but that because the notice of violation had not been returned when mailed to his father's home, it now believed he was no longer homeless.

[32] Presumably the CCO did not report Stewart's driving offense to the Kittitas court because Stewart was not a first-time offender when he was sentenced in Kittitas County, and the condition to maintain law-abiding behavior in that court's sentence was invalid. *See, e.g., State v. Shove*, 113 Wn.2d 83, 776 P.2d 132 (1989); *State v. Raines*, 83 Wn. App. 312, 922 P.2d 100 (1996); *Barclay*, 51 Wn. App.

had been properly instructed on the plaintiff's burden, the record contains no evidence, just speculation, and is insufficient as a matter of law to satisfy the plaintiff's burden of proving that, but for the CCO's decision to request a hearing rather than a warrant for Stewart's arrest, Joyce would not have died. *See Bell*, 147 Wn.2d at 179.

### *Instruction 16*

In addition, the trial court misinstructed the jury that a CCO was required to report all violations of community supervision within 30 days of learning of them:

> The Department of Corrections, through its community corrections officers, is legally responsible for reporting violations of any conditions of community supervision to the Superior Court which sentenced the felon and must take action within 30 days of learning of a violation.

11 CP at 2044.

The instruction is based upon DOC DCC 200.700. But operational policies, directives, and procedures are internal processes, which can be used as management tools, they are not law. *Melville v. State*, 115 Wn.2d 34, 38, 793 P.2d 952 (1990) (holding that " 'statutory policy statements as a general rule do not give rise to enforceable rights and duties' " (quoting *Aripa v. Dep't of Soc. & Health Servs.*, 91 Wn.2d 135, 139, 588 P.2d 185 (1978))); *Fischer-McReynolds v. Quasim*, 101 Wn. App. 801, 812, 6 P.3d 30 (2000) (holding that the governor "cannot create obligations, responsibilities, conditions, or processes having the force and effect of law merely by issuing an executive order"). The policy was admissible as evidence on the issue of the CCO's knowledge and negligent conduct only. Former RCW 5.40.050 (1986). But because a policy does not have the force of law, it was error for the trial court to instruct the jury that, in effect, a CCO who did not report a violation of any condition of community supervision to the court within 30 days of

at 407 (only a first-time offender may be ordered to refrain from committing new offenses).

learning of the violation had violated the law and was, therefore, negligent. Former RCW 5.40.050.

### Instruction 20

Instruction 20, likewise, misinformed the jury on the extent of the CCO's authority to control Stewart. It stated in relevant part that a CCO has the authority to arrest an offender when "the offender presents a danger to the community." 11 CP at 2048. A CCO may arrest or cause the arrest of an offender only when the offender violates "any of the requirements or conditions of a sentence" or commits a crime in the CCO's presence. The trial court's instruction 20 misstated the law to the jury by stating that the CCO had the authority to arrest Stewart if he believed Stewart presented a danger to the community. This is not an accurate statement of the statute. *See* RCW 9.94A.634(3) (formerly RCW 9.94A.200). Moreover, it violates Washington's state constitution. WASH. CONST. art. I, § 7.

The State objected to the giving of instruction 20.[33] The instruction clearly misinformed the jury regarding the CCO's authority to arrest Stewart on the CCO's mere belief that Stewart appeared to present a danger to the community.[34] Thus, the court's instruction 20 misinformed the jury

---

[33] The majority asserts that the State's exception to instruction 20—"that it fails to take into consideration other factors, such as the [offender's] statutory and constitutional protections . . . ." (10 Report of Proceedings at 1493)—was inadequate to preserve a challenge to instruction 20 for our review. I disagree. The instruction is patently false and obviously violates the right to be free from unconstitutional seizure and arrest. Moreover, plaintiffs miscited the authority supporting the instruction to the court and opposing counsel. The citations to the plaintiff's proposed instruction 18 (which is identical with the court's instruction 20) indicate without qualification that the language used in the proposed instruction has been taken directly from former RCW 9.94A.195 and DOC DCC 200.710. The instruction's proposed language—the offender presents a danger to the community—is not found in the statute. Moreover, the DOC DCC cited addresses mandatory savings accounts for prison/prerelease/work release inmates, and is thus inapplicable.

[34] I note also that Stewart voluntarily sought mental health treatment and such treatment was not a condition of his community supervision. *See Raines*, 83 Wn. App. at 316. Moreover, had it been a condition of his community supervision, the law requires that "the civil detention and commitment procedures of chapter 71.05 RCW shall be considered in preference to incarceration in a local or state

about the law and deprived the State and its taxpayers of a fair trial.

The trial court erroneously instructed the jury regarding the duties and authority of a CCO monitoring an offender on community supervision and allowed inadmissible testimonial evidence to be presented to the jury. Thus the jury reached its verdict guided by an improper statement of the law, without notice of the controlling "but for" causation standard it was required to apply, and asked to base its decision on speculative and inadmissible testimony.[35] Therefore, I would reverse and remand for a new trial before a jury that is properly instructed on the law and its application to competent evidence.

Reconsideration denied May 22, 2003.

Review granted at 150 Wn.2d 1032 (2004).

---

correctional facility." RCW 9.94A.634(3)(e). Stewart was evaluated by mental health professionals the day before the collision. They determined that he did not meet the threshold for commitment under chapter 71.05 RCW. The trial court erred when it refused to allow the State to defend against the Joyce family's claim that DOC's oversight of Stewart's mental health was a "gross dereliction of duty" (3 CP at 482), because under the terms of Stewart's SRA sentence, DOC had no lawful authority or duty to oversee his mental health treatment. *See* RCW 9.94A.634(3)(e).

